Anthony J. Belkowski AB2676
**HEDINGER & LAWLESS**
110 Wall Street, 11th Floor
New York, New York 10005-3817
Tel: (212) 759-8203
Fax: (212) 751-2984

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **SILVEX DESIGNS, INC,** | |
| Plaintiff, | Case No. 07-cv-03740-KMK-MDF |
| -against- | |
| **FAST FLEET SYSTEMS, INC., and QUEBECOR WORLD LOGISTICS, INC., d/b/a Q.W. EXPRESS** | **THIRD-PARTY COMPLAINT OF DEFENDANT, FAST FLEET SYSTEMS, INC. AGAINST THIRD-PARTY DEFENDANTS NICA, INC., JIRARI CORP., AND HICHAM JIRARI, individually.** |
| Defendants, | |
| -against- | |
| **ONE BEACON INSURANCE COMPANY, STATION OPERATOR SYSTEMS, INC. INTEGRITY TRANSPORT, INC., and EDWARD EGAN, individually,** | |
| Third-Party Defendants. | |

---

*LAW OFFICE OF*
*HEDINGER*
*&*
*LAWLESS*

Defendant/Third-Party Plaintiff, Fast Fleet Systems, Inc. ("Fast Fleet"), by and

through its attorneys, Hedinger & Lawless, Esqs., as and for a Third-Party Complaint

against Third-Party Defendants, NICA, Inc., Jirari Corp. and Hicham Jirari, individually,

hereby alleges and says:

## PARTIES, JURISDICTION AND VENUE

1.      Jurisdiction is predicated upon 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 1337 since the claim arises out of interstate transport of goods by motor carrier pursuant to the Carmack Amendment, 49 U.S.C. § 14706 and since there is diversity of citizenship between the parties and the Plaintiff's damages are alleged to exceed $75,000.

2.      Upon information and belief, plaintiff, Silvex Designs, Inc. (hereinafter "Silvex"), is a corporation organized and existing by virtue of the laws of New York in the United States, engaged in the business of retail of silver jewelry, with a principal place of business located at 330 5th Avenue, New York, New York.

3.      Upon information and belief, Quebecor World Logistics, Inc. d/b/a Q.W. Express (hereinafter "Q.W. Express"), is a corporation organized and existing by virtue of the laws of Illinois in the United States, engaged in business as a common carrier of goods, with an office and place of business located at 1130 West Thorndale, Bensenville, Illinois.

4.      Defendant/third-party plaintiff, Fast Fleet Systems, Inc., (hereinafter "Fast Fleet") is a corporation organized and existing by virtue of the laws of New Jersey in the United States, with an office and place of business located at 407 Green Avenue, Brielle, New Jersey.

5.      Upon information and belief, third-party defendant, One Beacon Insurance Company ("One Beacon") is an insurance company duly organized under the laws of the State of Massachusetts in the United States, with an office and place of business located at One Beacon Street, Boston, Massachusetts.

*LAW OFFICE OF*
*HEDINGER*
*&*
*LAWLESS*

4156/3557gs                                        2

6.     Third-party defendant, Station Operator Systems, Inc. ("SOS") is a New Jersey corporation engaged in the business of providing transportation services having an office and place of business at 475 Division Street, Elizabeth, New Jersey.

7.     Third-party defendant, Integrity Transport, Inc. ("IT") is a New Jersey corporation engaged in the business of providing transportation services having an office and place of business at 475 Division Street, Elizabeth, New Jersey.

8.     Third-party defendant, Edward Egan, is an individual and the president of SOS.

9.     Upon information and belief, NICA, Inc. ("NICA") is a corporation organized and existing by virtue of the laws of Massachusetts in the United States, engaged in the business of providing individuals and independent contractor drivers to common carriers of goods, having an office and place of business at 761 Granite Street, Braintree, Massachusetts.

10.    Upon information and belief, third-party defendants, Jirari Corp. and/or Hicham Jirari ("Jirari") is/are an independent contractor engaged in the business of providing messenger/delivery and other contracted services and related activities from or to various common carriers who have contracted for these services.  Jirari Corp. and Jirari have an office and place of business at 1218 73rd Street, North Bergen, New Jersey.

*LAW OFFICE OF*
*HEDINGER*
*&*
*LAWLESS*

## COUNT ONE

11.    Fast Fleet repeats the allegations of Paragraphs 1 through 10 of this Third-Party Complaint as if set forth at length herein.

4156/3557gs                                   3

12.     Silvex has commenced the above-captioned action against Fast Fleet for the reasons more fully set forth in its Amended Complaint, a copy of which is annexed hereto as **Exhibit "A."**

13.     Fast Fleet has denied the allegations of the Amended Complaint and has asserted a counterclaim against Silvex, a crossclaim against Q.W. Express and a third-party complaint against One Beacon, SOS, IT and Egan. A copy of this pleading is annexed hereto as **Exhibit "B."** The allegations of this pleading are incorporated herein as if set forth at length.

14.     Upon information and belief, SOS entered into an agreement dated June 1, 2002 with NICA pursuant to which NICA would provide to SOS individuals and/or independent contractors as drivers for SOS. A copy of this agreement is annexed hereto as **Exhibit "C."**

15.     Upon information and belief, NICA provided to SOS Jirari Corp. and/or Jirari for messenger/delivery and other contracted services and related activities as driver to SOS pursuant to Jirari Corp. and/or Jirari's agreement with NICA dated August 16, 2005. A copy of this agreement is annexed hereto as **Exhibit "D."**

*LAW OFFICE OF*
*HEDINGER*
*&*
*LAWLESS*

16.     Jirari Corp. and/or Jirari, through NICA actually provided the services (on behalf of SOS, IT and Fast Fleet) rendered to Q.W. Express in connection with Silvex's shipment. At no time was the shipment in the care, custody or control of Fast Fleet, except through its contractors SOS, IT, Edward Egan, individually, Jirari Corp., Jirari and NICA.

17.     In the event that Silvex is successful in proving all or any part of its claims against Fast Fleet, Fast Fleet seeks indemnification and/or contribution from and

4156/3557gs                                         4

judgment against Jirari Corp., Jirari individually and NICA, jointly and severally, as the alleged damages sought by plaintiff in the Complaint were all a direct and proximate result of the fault of Jirari Corp., Jirari and NICA, and were not attributable to the negligence or misconduct of Fast Fleet. Accordingly, Fast Fleet is entitled to indemnification from Jirari Corp., Jirari and NICA for any amount of any judgment rendered in favor of plaintiff and for the costs of its defense herein.

18.     Any damages allegedly sustained by Silvex were proximately caused by the acts and omissions of Jirari Corp., Jirari and NICA and each of them, and not by any active or passive fault on the part of Fast Fleet.

**WHEREFORE**, Defendant/Third-Party Plaintiff prays for judgment against Third-Party Defendants, Jirari Corp., Jirari and NICA, jointly and severally, compelling them to defend, indemnify and hold Fast Fleet harmless from plaintiff's claims in this action; and in the event of any judgment granted plaintiff against Fast Fleet, judgment over against Jirari Corp., Jirari and NICA, jointly and severally, in the same amount as any judgment so granted plaintiff and indemnifying Fast Fleet, and awarding costs, attorneys' fees and such other and further relief as this Court deems just and proper, including compensatory and other damages against these third-party defendants.

*LAW OFFICE OF*
*HEDINGER*
*&*
*LAWLESS*

Dated:  New York, New York
        November 6, 2007

**HEDINGER & LAWLESS**
Attorneys for Defendant,
Fast Fleet Systems, Inc.

By:

Anthony J. Belkowski AB2676
110 Wall Street, 11th Floor
New York, New York 10005-3817
Tel:  (212) 759-8203
Fax:  (212) 751-2984
Email:  abelkowski@hedlaw.com

4156/3557gs                    5

**TO:**   **Brian T. DelGatto, Esq.**
WILSON, ELSER, MOSKOWITZ
Three Gannett Drive
White Plains, New York 10604

**Barry N. Gutterman, Esq.**
Barry N. Gutterman Associates, P.C.
60 East 42nd Street, 46th Floor
New York, New York 10165

**Andrew Robert Brown, Esq.**
Hill, Rivkins and Hayden
45 Broadway
New York, New York 10006

Station Operator Systems, Inc.
475 Division Street
Elizabeth, New Jersey 07201

Integrity Transport, Inc.
475 Division Street
Elizabeth, New Jersey 07201

Edward Egan
8 Burnside Court
Cranford, New Jersey 07016-2630

Jirari Corp.
1218 73rd Street
North Bergen, New Jersey 07047

Hicham Jirari
1218 73rd Street
North Bergen, New Jersey 07047

NICA, Inc.
761 Granite Street
Braintree, Massachusetts 02185

*LAW OFFICE OF*
*HEDINGER*
*&*
*LAWLESS*

4156/3557gs                    6

**UNITED ST.    ES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SILVEX DESIGNS, INC,**

     Plaintiff,       Case No.  07-cv-03740-KMK-MDF

-against-

**FAST FLEET SYSTEMS, INC., and**
**QUEBECOR WORLD LOGISTICS, INC.,**
**d/b/a Q.W. EXPRESS**

     Defendants,

-against-

**ONE BEACON INSURANCE COMPANY,**
**STATION OPERATOR SYSTEMS, INC.**
**INTEGRITY TRANSPORT, INC., and**
**EDWARD EGAN, individually,**

     Third-Party Defendants.

---

**THIRD-PARTY COMPLAINT OF DEFENDANT, FAST FLEET SYSTEMS, INC.**
**AGAINST THIRD-PARTY DEFENDANTS NICA, INC., JIRARI CORP.**
**AND HICHAM JIRARI, individually.**

**HEDINGER & LAWLESS**
110 Wall Street, 11th Floor
New York, New York 10005-3817
(212) 759-8203
Attorneys for Defendant,
Fast Fleet Systems, Inc.

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

SILVEX DESIGNS, INC.,                                    07-cv-03740-UA-MDF

        Plaintiff,

                                      **AMENDED COMPLAINT**

   -against-

FAST FLEET SYSTEMS, INC. and
QUEBECOR WORLD LOGISTICS, INC.
d/b/a Q.W. EXPRESS,

        Defendants.

-----------------------------------------------------------X

      COMES NOW Plaintiff, SILVEX DESIGNS, INC. by and through its attorneys,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, for its claims and causes of

action against FAST FLEET SYSTEMS, INC. and QUEBECOR WORLD LOGISTICS, INC.

d/b/a Q.W. EXPRESS, alleges upon information and belief, as follows:

## PARTIES, JURISDICTION AND VENUE

    1.     Jurisdiction is predicated upon 28 § U.S.C. § 1331, 28 § U.S.C. § 1332(a)(2) and

28 § U.S.C. § 1337 since the claim arises out of interstate transport of goods by motor carrier

pursuant to the Carmack Amendment, 49 U.S.C. § 14706 and since there is diversity of

citizenship between the parties and the Plaintiff's damages exceed \$75,000.

    2.     Plaintiff, Silvex Designs, Inc. (hereinafter "Silvex"), is a corporation organized

and existing by virtue the laws of New York in the United States, engaged in the business of

retail of silver jewelry, with a principal place of business located at 330 5th Avenue, New York,

New York.

    3.     Defendant, Quebecor World Logistics, Inc. d/b/a Q.W. Express (hereinafter

"Q.W. Express"), is a corporation organized and existing by virtue of the laws of Illinois in the

1

United States, engaged in business as a common carrier of goods, with an office and place of business located at 1130 West Thorndale, Bensenville, Illinois.

4    Defendant, Fast Fleet Systems, Inc., (hereinafter "Fast Fleet") is a corporation organized and existing by virtue of the laws of New Jersey in the United States, engaged in business as a common carrier of goods, with an office and place of business located at 407 Green Avenue, Brielle, New Jersey.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

5.    Plaintiff, Silvex, is the received, consignee, owner and/or assured of the consignment hereinbelow described. Plaintiff, Silvex, brings this action on its own behalf and as agent and/or trustee on behalf of and for the interest of all parties who may be or become interested in the said consignment, as their respective interest may ultimately appear, and Plaintiff is entitled to maintain this action.

6.    On or about August 29, 2006, Plaintiff, Silvex, retained Defendant, Q.W. Express, to transport a consignment of approximately 4009 pound of sterling silver jewelry, contained in 69 trunks, from Silvex's principle place of business in New York to Rodeway Inn, 1365 West Grant, Tucson, Arizona, the location of a trade show where Plaintiff intended to market the aforementioned jewelry, all in consideration of an agreed freight rate. (See copy of Bill of Lading attached hereto as Exhibit "A".)

7.    On or about August 29, 2006, Q.W. Express retained Defendant, Fast Fleet to transport the aforementioned jewelry all or part of the route from Plaintiff's principal place of business to the intended destination in Tucson, Arizona.

2

8.      On August 29, 2006, Fast Fleet picked up the aforementioned jewelry consignment from Plaintiff's principle place of business in good order and condition and weighing in total approximately 4009 pounds.

9.      The aforementioned consignment was transported by Fast Fleet from Plaintiff's principle place of business to a location in Newark, New Jersey, where the aforementioned consignment was consolidated with other goods prior to being transported to the intended destination in Tucson, Arizona.

10.     When the consignment arrived at Newark, New Jersey, it was weighed prior to consolidation and transport to the intended destination in Tucson, Arizona. The total weight of the jewelry consignment delivered by Fast Fleet to Newark, New Jersey was 3084 pounds. (See copy of Invoice from Q.W. Express dated September 19, 2006, Bill No. LEX3171137, attached hereto as Exhibit "B".)

11.     When the consignment arrived at its intended destination in Tucson, Arizona on September 6, 2006, it was ascertained that approximately 925 pound of jewelry, approximately half the content of jewelry in each trunk, were missing. (See copy of City of Tucson, Arizona Police Report, Case No. 0609060238, dated September 6, 2006, attached hereto as Exhibit "C".)

## COUNT I

## QUEBECOR WORLD LOGISTICS, INC. d/b/a Q.W. EXPRESS

### NEGLIGENCE

12.     Plaintiff, Silvex, hereby incorporates all of the previous allegations as set forth herein.

3

13.    Defendant, Q.W. Express, failed to deliver the consignment to the plaintiff at the designated point of delivery in the same good order and condition as when received by it in New York, New York.

14.    The damage sustained to the aforementioned consignment of jewelry did not result from any act or omission on the part of Plaintiff, Silvex, but, to the contrary, was the result in whole or in part, of the negligence and or fault of Defendant, Q.W. Express.

15.    By reason of the foregoing, Plaintiff has damages in a total amount of no less than $332.872.96, as nearly as presently can be determined, no amount of which has been paid, although duly demanded on numerous occasions beginning on September 6, 2006.

WHEREFORE, Plaintiff prays:

16.    That process in due form of law may issue against the Defendant, Q.W. Express, citing it to appear and answer all and singular the matters aforesaid;

17.    That judgment may be entered in favor of Plaintiff against the Defendant, Q.W. Express, for the amount of Plaintiff's damages, together with interest and costs and the disbursements of this action,; and

18.    That this Court grant to Plaintiff such other and further relief as may be just and proper.

## COUNT II

### NEGLIGENCE OF FAST FLEET, INC.

### NEGLIGENCE

19.    Plaintiff, Silvex, hereby incorporates all of the previous allegations as set forth herein.

4

20.     Defendant, Fast Fleet, failed to deliver the consignment to the plaintiff at the designated point of delivery in the same good order and condition as when received by it in New York, New York.

21.     The damage sustained to the aforementioned consignment of jewelry did not result from any act or omission on the part of Plaintiff, Silvex, but to the contrary, was the result in whole or in part, of the negligence and or fault of Defendant, Fast Fleet.

22.     By reason of the foregoing, Plaintiff has damages in a total amount of no less than $332.872.96, as nearly as presently can be determined, no amount of which has been paid, although duly demanded on multiple occasions, beginning on December 13, 2006.

WHEREFORE, Plaintiff prays:

23.     That process in due form of law may issue against the Defendant, Fast Fleet, citing it to appear and answer all and singular the matters aforesaid;

24.     That judgment may be entered in favor of Plaintiff against the Defendant, Fast Fleet, for the amount of Plaintiff's damages, together with interest and costs and the disbursements of this action,; and

25.     That this Court grant to Plaintiff such other and further relief as may be just and proper.

26.     Plaintiff hereby demands a TRIAL BY JURY pursuant to Fed. R. Civ. P. Rule 38.

Dated: White Plains, New York
       May 21, 2007

5

75896.1

THE PLAINTIFF,
SILVEX DESIGNS, INC.

By _____
Brian Del Gatto BD 7759
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP
3 Gannett Drive
White Plains, NY 10604
Tel: (914) 323-7000
Fax: (914) 323-7001
Our File No.: 09945.00001

6

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the above and foregoing was sent via U.S. Mail, postage prepaid, on the 21st day of May, 2007 to the following:

*Defendant, Fast Fleet Systems, Inc.*
Fast Fleet Systems, Inc.
407 Green Avenue
Brielle, NJ 08730

*Defendant, Quebecor World Logistics, Inc.*
*d/b/a O.W.Express*
Quebecor World Logistics, Inc.
1130 West Thorndale
Bensenville, IL 60106

Brian Del Gatto BD 7759

7

75896.1

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                                   ) ss.:

COUNTY OF WESTCHESTER    )

Ileana Cordova, being duly sworn, deposes and says: that deponent is not a party to this

action, is over the age of 18 years and resides in Westchester County, New York. On the 21st

day of May, 2007, deponent served the **NOTICE OF AMENDED COMPLAINT AND**

**AMENDED COMPLAINT** upon:

TO:    **_Defendant, Fast Fleet Systems, Inc._**
       Fast Fleet Systems, Inc.
       407 Green Avenue
       Brielle, NJ 08730

       **_Defendant, Quebecor World Logistics, Inc. d/b/a Q.W.Express_**
       Quebecor World Logistics, Inc.
       1130 West Thorndale
       Bensenville, IL 60106

at the address designated by said attorney for that purpose by depositing a true copy of same

enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive

care and custody of the United States Post Office within the State of New York.

Ileana Cordova

Sworn to before me this
21st day of May, 2007

Notary Public

GLADYS CAMPBELL
Notary Public, State of New York
No. 01CA4693890
Qualified in Bronx County
Commission Expires Sept. 30, 2069

75923.1

Docket No. 07-cv-03740-UA-MDF

**Brian Del Gatto**
**09945.00001**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVEX DESIGNS, INC.,

        **Plaintiff,**

FAST FLEET SYSTEMS, INC. and, QUEBECOR WORLD
LOGISTICS, INC. d/b/a Q.W EXPRESS,

        **Defendants.**

## AMENDED COMPLAINT

### WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

*Attorneys For* **SILVEX DESIGNS, INC.**

*Office & Post Office Address, Telephone*
3 Gannett Drive
White Plains, NY 10604
914-323-7000

# EXHIBIT

# A

09/23/2006    15:13    859 253 9137 → 12127581173    NO.553    D02

# Q. W. Express

**QWEXPRESS**

P.O. BOX 940

BENSENVILLE, IL 60106
Phone: 877-732-8738  FAX: 847-952-4904

## Bill of Lading

Date: 08/29/2006    Bill Number: LEX317137
Payor: CRPD    Origin: EWR    Dest: TUS

| Shipper Reference | Receiver Reference GLW / BTH # EC22-35 |
|---|---|
| SILVEX DESIGN<br>330 5TH AVENUE<br>SUITE 608<br>NEW YORK  NY. 10001<br>ATHENA MACY-MEIER | RODEWAY INN<br>1365 WEST GRANT<br><br>TUCSON AZ. 85745<br>SILVEX IMAGES |

| Pieces | Weight | Description | Pcs | L | W | H | DimWt | Service Requested |
|---|---|---|---|---|---|---|---|---|
| 69 | 0 | EXHIBIT MATERIAL | | | | | 0 | DEFERRED |
| 69 | 0 | Totals | | Chargeable Weight 0 | | | | COD:  $0.00<br>Declared Value:  $0.00 |

Delivery Remarks: MUST DELIVER ON 09/06/06 @ 9 AM GLW / SILVEX IMAGES / BTH # EC22-35

Customer

SILVEX DESIGN
330 5TH AVENUE
SUITE 608
NEW YORK  NY. 10001
FAX: 212 760-1173

_____
Shipper's (Name, Date and Time)

_____
Received by (Name, Date and Time)

# EXHIBIT

# B

VICTIM MAY PHOTOCOPY FORM AS MANY TIMES AS NEEDED

| TYPE OF REPORT (X in Appropriate Box) | DATE OF CRIME 9/6/06 | CASE NO. 0609060238 |
|---|---|---|
| ☐ BURGLARY ☐ ROBBERY ☐ THEFT FROM VEHICLE ☐ PURSE SNATCH ☐ STRONG ARM ROBBERY ☒ THEFT | VICTIM (FIRM IF BUSINESS) SILVEX DESIGNS | LOCATION OF OCCURENCE 1365 W. GRANT #143 |
| | CRIME CLASSIFICATION 06.10 | OFFICER'S NAME, PR # AND TEAM BROADWAY 35642 ODW |

## PLEASE PRINT

LIST ADDITIONAL ITEMS TAKEN WITH AS COMPLETE A DESCRIPTION AS POSSIBLE. FOLD, SIGN, SEAL, AND DROP IN MAILBOX. USE BLACK INK.

**EXAMPLE**

| Type of Item | Brand Name or Bank Number | Model Number Acct./ Card No. | Serial No. or Check Numbers | Color and / or Caliber | Size and / or Style | Value |
|---|---|---|---|---|---|---|
| T.V. SET | SONY | DR200 | 5100 3548 | BROWN CABINET | 25 COLOR | $650.00 |
| RIFLE | WEATHERBY | 7005 | ZTN35621 | BLU STOCK 270 CAL | SPORTER SEMI. AUTO | $345.00 |

IF THE APPROPRIATE CATEGORIES ARE NOT AVAILABLE ON THIS FORM OR ADDITIONAL SPACE IS NECESSARY TO DESCRIBE AN ITEM, FEEL FREE TO USE TWO LINES.

TOTAL $695.00

| Type of Item | Brand Name or Bank Number | Model Number Acct./ Card No. | Serial No. or Check Numbers | Color and / or Caliber | Size and / or Style | Value |
|---|---|---|---|---|---|---|
| 67648gm | Sterling Earrings | | .925 | ASST | ASST | 52765.44 |
| 54656gm | Sterling Bracelets | | .925 | " | " | 42631.68 |
| 100800gm | Sterling Pendants | | 925 | " | " | 78624.00 |
| 11648gm | Sterling Vermeil Jewelry | | .925 | Gold | " | 10483.20 |
| 37184gm | Sterling Rings | | .925 | ASST | " | 29003.55 |
| 8064gm | Sterling+Mystic Topaz | | .925 | " | " | 10080.00 |
| 6272gm | Sterling Blue Topaz | | .925 | Blue Stones | " | 7840.00 |
| 26432gm | Sterling Beads+Findings | N/A | | Silver | " | 14537.60 |
| 4928gm | Sterling & CZ Jewelry | | .925 | Silver | White CZs | 4188.80 |
| 79744gms | Stone Beaded Jewelry w/ silver accents | | | Silver | ASST | 62200.32 |
| 25984gms | Sterling + Turquoise Jewelry | | | Blue & Silver | | 15590.40 |

MAKE SURE ALL BLANKS ARE FILLED OUT DESCRIBING PROPERTY

| **NOTE:** If you come up with additional information that you believe will help solve the crime, please list the information below. | **NOTICIA:** Si usted halla información adicional que cree que nos asistirá en resolver su caso, por favor escríbela información debajo de este línea. |
|---|---|

| 9856g | Sterling Jewelry w/ no stones (plain silver) | 4928.00 |
| | Total $332,872.96 | |

ADDITIONAL SPACE PROVIDED ON BACK

PLEASE SIGN YOUR FULL NAME HERE: Athena Macy-Meier  *Athena Macy*

TODAY'S DATE  9-10-06

**CITIZEN'S MAIL-IN DEPARTMENTAL REPORT FORM**      **CITY OF TUCSON, ARIZONA - POLICE DEPARTMENT**

TPD 1832 (06/00)                                                                 78-6-1832-7 (08/00)

# EXHIBIT

# C



**QWEXPRESS**
a division of Quebecor World Logistics
13158 COLLECTIONS CENTER DRIVE
CHICAGO, IL 60693
(877) 536-5526

QWE Invoice Date

SEP 1 9 2006

| DATE | BILL NUMBER | | |
|------|-------------|---|---|
| 08/29/2006 | LEX317137 | | |
| PAYOR | ORIGIN | DESTINATION | |
| CRPD | EWR | TUS | |

RECEIVER
REFERENCE GLW / BTH # EC22

**S H I P P E R**
SHIPPER REFERENCE

SILVEX DESIGN
330 5TH AVENUE
SUITE 808
NEW YORK  NY. 10001

**R E C E I V E R**
RODEWAY INN
1365 WEST GRANT
TUCSON AZ. 85745

| PIECES | WEIGHT | DESCRIPTION | PIECES | LENGTH | WIDTH | HEIGHT | DIM WT. | SERVICE REQUESTED |
|--------|--------|-------------|--------|--------|-------|--------|---------|-------------------|
| 68 | 3084 | EXHIBIT MATERIAL | 2 | 48 | 40 | 46 | 2092 | DEFERRED |
| | | | 1 | 49 | 51 | 46 | | |
| | | | 1 | 48 | 40 | 37 | | |
| | | | 1 | 50 | 48 | 18 | | |

| | | | DECLARED VALUE | $0.00 |
|---|---|---|---|---|
| 68 | 3084 | TOTALS | CHARGEABLE WEIGHT | 3084 |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| Freight Charges ($0.7500) | $2,313.00 |
| Dec Value | $0.00 |
| 2 Man Pickup | $75.00 |
| Lift Gate Pickup | $60.00 |
| Special Pickup | $70.00 |
| Waiting Time | $40.00 |
| Inside Pickup | $95.00 |
| Palletizing/Shrink Wrap | $125.00 |
| Special Delivery | $45.00 |
| Hotel Delivery | $25.00 |

PAYOR:

SILVEX DESIGN
330 5TH AVENUE
SUITE 808
NEW YORK  NY. 10001

| TOTAL AMOUNT DUE: | $2,848.00 |
|---|---|

PLEASE RETURN BOTTOM PORTION WITH YOUR PAYMENT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PLEASE REMIT TO:

**QWEXPRESS**
a division of Quebecor World Logistics
13158 Collections Center Drive
Chicago, IL 60693
(877) 536-5526

SILV18355

BILL NUMBER

LEX317137

TOTAL AMOUNT DUE

$2,848.00

"This invoice is subject to Quebecor World's
standard terms and conditions of sale or to the terms
and conditions contained in a written agreement
agreed to by both parties. Net terms are 15 days. Any
past due balance will be subject to an interest rate not
to exceed 1.5% per month, or as indicated in a written
agreement between the parties. This statement does
not supercede any written contractual terms of sale."

We accept Visa, MC and American Express

# EXHIBIT "B"

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

|  | |
|---|---|
| Southern | District of    New York |

SYLVEX DESIGNS, INC.,
Plaintiff,

-against-
FAST FLEET SYSTEMS, INC., and QUEBECOR
WORLD LOGISTICS, INC. d/b/a Q.W. EXPRESS,

**SUMMONS IN A CIVIL ACTION**

    Defendants.
-against-

CASE NUMBER:

ONE BEACON INSURANCE COMPANY,
STATION OPERATOR SYSTEMS, INC.,
INTEGRITY TRANSPORT, INC and
EDWARD EGAN, individually
    Third-Party Defendants.

**07-cv-03740-UA-MDF**

TO: (Name and address of Defendant)

Station Operator Systems, Inc.
475 Division Street
Elizabeth, NJ 07201
908-558-9600

    **YOU ARE HEREBY SUMMONED** and required to serve on Third-Party Plaintiff's Attorney:

        LAWRENCE P. THEES, ESQ
        407 Green Avenue
        Brielle, New Jersey 08730
        732-489-7900, Fax 732-875-0753
        Attorney for Third-Party Plaintiff, Fast Fleet Systems, Inc.

an answer to the complaint which is served on you with this summons, within ___thirty (30)___ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

_____
CLERK

_____
(By) DEPUTY CLERK

_____July 11, 2007_____
DATE

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant. Place where served:

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left:

☐  Returned unexecuted:

☐  Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                        Date                              *Signature of Server*


                                    _____
                                    *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____X

SILVEX DESIGNS, INC.,

      Plaintiff,

-against-

FAST FLEET SYSTEMS, INC., and QUEBECOR

WORLD LOGISTICS, INC. d/b/a Q.W. EXPRESS,

      Defendants.

-against-

ONE BEACON INSURANCE COMPANY,

STATION OPERATOR SYSTEMS, INC.,

INTEGRITY TRANSPORT, INC and

EDWARD EGAN, individually

      Third-Party Defendants.

_____X

**07-cv-03740-UA-MDF**

**FRCP RULE 7.1**
**DISCLOSURE STATEMENT**

Defendant, Fast Fleet Systems, Inc. by and through its attorney Lawrence Thees, submits in

duplicate its Disclosure Statement pursuant to Fed. R. Civ. P. Rule 7.1.and states: Fast Fleet

Systems, Inc. has no publicly traded corporate parents, subsidiaries or affiliates.

Dated: July 10, 2007

**LAWRENCE P. THEES, ESQ**
Attorney for Defendant, Fast Fleet Systems, Inc.

By:   /s/ Lawrence P. Thees
407 Green Avenue
Brielle, New Jersey 08730

732-489-7900, Fax 732-875-0753

**LAWRENCE P. THEES, ESQ**
407 Green Avenue
Brielle, New Jersey 08730
732-489-7900, Fax 732-875-0753
Attorney for Defendant, Fast Fleet Systems, Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____ X

SILVEX DESIGNS, INC.,                                    **07-cv-03740-UA-MDF**

     Plaintiff,

-against-                                                **ANSWER TO PLAINTIFF'S**
                                                         **AMENDED COMPLAINT,**
                                                         **COUNTERCLAIM, CROSS-CLAIM**
FAST FLEET SYSTEMS, INC., and QUEBECOR                   **AND THIRD-PARTY COMPLAINT OF**
                                                         **DEFENDANT, FAST FLEET**
WORLD LOGISTICS, INC. d/b/a Q.W. EXPRESS,                **SYSTEMS, INC.**

     Defendants.

-against-

ONE BEACON INSURANCE COMPANY,

STATION OPERATOR SYSTEMS, INC.,

INTEGRITY TRANSPORT, INC and

EDWARD EGAN, individually

     Third-Party Defendants.

_____ X

Defendant, Fast Fleet Systems, Inc. ("Fast Fleet"), by and through its attorney Lawrence Thees, as

and for its Answer to the Amended Complaint of plaintiff, Silvex Designs, Inc. ("Silvex",) with

Counterclaim, Cross-Claim and Third-Party Complaint, hereby responds as follows:

## PARTIES, JURISDICTION AND VENUE

1.   Defendant Fast Fleet denies the allegations set forth in paragraph 1 of the Amended

Complaint.

2.    Defendant Fast Fleet denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2 of the Amended Complaint.

3.    Defendant Fast Fleet admits that it is a corporation organized and existing by virtue of the laws of New Jersey, with an office and place of business located at 407 Green Avenue, Brielle, New Jersey.   Except as otherwise specifically admitted, Defendant Fast Fleet denies the remaining allegations set forth in paragraph 3 of the Amended Complaint.

4.    Defendant Fast Fleet denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in paragraph 4 of the Amended Complaint.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

5.    Defendant Fast Fleet denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5 of the Amended Complaint.

6.    Defendant Fast Fleet admits that on or about August 29, 2006, plaintiff Silvex retained Defendant QUEBECOR WORLD LOGISTICS, INC. d/b/a Q.W. EXPRESS, ("QWE") to arrange for the transportation of a consignment said to contain exhibit materials from New York to Tucson, Arizona. Except as otherwise specifically admitted, Defendant Fast Fleet denies the remaining allegations set forth in paragraph 6 of Amended Complaint

7.    Defendant Fast Fleet admits that on or about August 29, 2006, QWE retained Defendant Fast Fleet Systems, Inc., as their agent, to transport a consignment said to contain exhibit materials from plaintiff's place of business in New York, to Newark Liberty International Airport. Except as otherwise specifically admitted, Defendant Fast Fleet denies the remaining allegations set forth in paragraph 7 of the Amended Complaint.

8.    Defendant Fast Fleet denies the allegations set forth in paragraph 8 of the Amended Complaint.

9.    Defendant Fast Fleet denies the allegations set forth in paragraph 9 of the Amended Complaint.

10. Defendant Fast Fleet denies the allegations set forth in paragraph 10 of the Amended Complaint.

11. Defendant Fast Fleet denies the allegations set forth in paragraph 11 of the Amended Complaint

## COUNT I

## QUEBECOR WORLD LOGISTICS. INC. d/b/a/ Q.W. EXPRESS

### NEGLIGENCE

12.    Defendant Fast Fleet repeats and re-alleges each and every admission, denial, and denial based upon lack of sufficient knowledge and information to form a belief as to the truth of the allegations set forth in paragraphs 1 through 11 of the Amended Complaint as if set forth herein at length.

13.    Defendant Fast Fleet denies the allegations set forth in paragraph 1 3 of the Amended Complaint,

14.    Defendant Fast Fleet denies the allegations set forth in paragraph 14 of the Amended Complaint

15.    Defendant Fast Fleet denies the allegations set forth in paragraph 15 of the Amended Complaint.

16.    Defendant Fast Fleet denies the allegations set forth in paragraph 16 of the Amended Complaint

17.    Defendant Fast Fleet denies the allegations set forth in paragraph 17 of the

Amended Complaint.

18.    Defendant Fast Fleet denies the allegations set forth in paragraph 18 of the Amended Complaint.

## COUNT II

### NEGLIGENCE OF FAST FLEET, INC.

19.    Defendant Fast Fleet repeats and re-alleges each and every admission, denial, and denial based upon lack of sufficient knowledge and information to form a belief as to the truth of the; allegations set forth in paragraphs 1 through 18 of the Amended Complaint as if set forth herein at length.

20.    Defendant Fast Fleet denies the allegations set forth in paragraph 20 of the Amended Complaint.

21.    Defendant Fast Fleet denies the allegations set forth in paragraph 21 of the Amended Complaint.

22.    Defendant Fast Fleet denies the allegations set forth in paragraph 22 of the Amended Complaint.

23.    Defendant Fast Fleet denies the allegations set forth in paragraph 23 of the Amended Complaint.

24.    Defendant Fast Fleet denies the allegations set forth in paragraph 24 of the Amended Complaint.

25.    Defendant Fast Fleet denies the allegations set forth in paragraph 25 of the Amended Complaint.

26.    Defendant Fast Fleet denies the allegations set forth in paragraph 26 of the Amended Complaint.

## FIRST AFFIRMATIVE DEFENSE

27.    Plaintiff fails to state a claim, in whole or part, upon which relief can be granted against Defendant Fast Fleet.

## SECOND AFFIRMATIVE DEFENSE

28.    Plaintiffs claims are barred by the applicable statue of limitations and/or the doctrine of laches and the "unclean hands" doctrine and the Amended Complaint should be dismissed.

## THIRD AFFIRMATIVE DEFENSE

29.    Plaintiff is not the real party in interest and/or the proper party to assert the claim.

## FOURTH AFFIRMATIVE DEFENSE

30.    The plaintiff has failed to mitigate its alleged loss.

## FIFTH AFFIRMATIVE DEFENSE

31.    The shipment described in plaintiff's Amended Complaint is subject to all the terms, conditions, and exceptions contained in certain bills of lading and/or air waybills then and there issued, by which the shippers and consignees of said bills of lading and/or air waybills agreed to be and are bound.

## SIXTH AFFIRMATIVE DEFENSE

32.    Plaintiff has failed to aver facts necessary to establish that Defendant Fast Fleet breached a duty that resulted in plaintiff sustaining damages.

## SEVENTH AFFIRMATIVE DEFENSE

33.    To the extent that the plaintiff suffered any loss or damage as alleged in the Amended Complaint, which is denied, that loss or damage occurred during a period of time when the goods

were not under the care, custody, or control of Defendant Fast Fleet.

## EIGHTH AFFIRMATIVE DEFENSE

34.    Any loss or damage to the shipment as alleged in the Amended Complaint, which is denied, arose or resulted from the pre-shipment condition of the goods and was not caused or contributed to by Defendant Fast Fleet.

## NINTH AFFIRMATIVE DEFENSE

35.    Any damages allegedly sustained by plaintiff are the result of acts, errors, omissions, or breaches by other third parties, persons or entities over which Defendant Fast Fleet has and had no control and for whose conduct Defendant

## TENTH AFFIRMATIVE DEFENSE

36.    If any shortage and/or damage and/or loss was sustained by the shipment referred to in the Amended Complaint, which is denied, such shortage, and/or damage, and/or loss was caused by or contributed to by the plaintiff or others acting on plaintiff's behalf.

## ELEVENTH AFFIRMATIVE DEFENSE

37.    The plaintiff has failed to join one or more indispensable parties to the suit.

## TWELFTH AFFIRMATIVE DEFENSE

38.    The damages alleged in the Amended Complaint are grossly inflated and plaintiff's calculation of the claimed amount is contrary to law both as to type and quantity,

### THIRTEENTH AFFIRMATIVE DEFENSE

39.    Plaintiff failed to give written notice of loss or damage as and when required pursuant to the standard terms and conditions of the applicable air waybill(s), contract(s) of carriage or other contracts, bills of lading, tariffs, and/or applicable regulations, statutes or treaties, and/or classifications in effect; the plaintiffs lawsuit is therefore barred.

### FOURTEENTH AFFIRMATIVE DEFENSE

40.    The amount of Defendant Fast Fleet's liability, if any, is limited in accordance with the standard terms and conditions of the applicable air waybills), contracts) of carriage or other contracts, bills of lading, tariffs, and/or applicable regulations, statutes or treaties, and/or classifications in effect.

### FIFTEENTH AFFIRMATIVE DEFENSE

41.    To the extent applicable, plaintiff's state law claims, as found in the Amended Complaint, are preempted by the Carmack Amendment to the Interstate Commerce Act, which said act provides certain duties and obligations applicable to plaintiff which plaintiff has failed to observe or comply with prior to instituting this action.

### SIXTEENTH AFFIRMATIVE DEFENSE

42.    To the extent plaintiffs damages include any special, incidental, or consequential damages, including but not limited to loss of profits, income, interest, or utility, or loss of market, resulting from the transportation of this shipment, regardless of whether Defendant Fast Fleet had, knowledge that such damages might be incurred, Defendant Fast Fleet is not liable, in accordance with the standard terms and conditions of the applicable air waybills), contract(s) of carriage or other

contracts, bills of lading, tariffs, and/or applicable regulations, statutes or treaties, and/or classifications in effect.

## SEVENTEENTH AFFIRMATIVE DEFENSE

43.    The jurisdiction and venue where the plaintiff commenced this suit is invalid; the relevant terms and conditions governing this transportation agreement state that the only jurisdiction and venue where this action can be commenced and advanced is in New Jersey,

## EIGHTEENTH AFFIRMATIVE DEFENSE

44.    Plaintiffs cargo was not permitted for shipment, as stated by the standard terms and conditions of the applicable air waybill(s), contract(s) of carriage or other contracts, bills of lading, tariffs, and/or applicable regulations, statutes or treaties, and/or classifications in effect; accordingly, the plaintiffs lawsuit is barred.

## NINETEENTH AFFIRMATIVE DEFENSE

45.    Defendant Fast Fleet was not properly provided with notice of claim as required by federal statutes as a condition precedent to bringing this action.

## TWENTIETH AFFIRMATIVE DEFENSE

46. Defendant Fast Fleet reserves its rights to amend its answer to add additional or other de Senses; to delete or withdraw defenses; and to add counterclaims and cross-claims as they may become necessary after reasonable opportunity for appropriate discovery.

## TWENTY FIRST AFFIRMATIVE DEFENSE

47. To the extent plaintiff's claims are based upon contract, there was no privity of contract between Fast Fleet Systems, Inc. and plaintiff. And any such claim is barred by the Statutes of Fraud. The Fast Fleet tariff and terms and conditions of carriage with QW Express, expressly limited Fast Fleet's liability to $.50 per pound for any part of the shipment lost, stolen or damaged, unless QW Express made prior arrangements in writing to secure excess valuation coverage.

## AS AND FOR A FIRST COUNTERCLAIM

48.        Fast Fleet repeats and realleges paragraphs 1 through 47 of its Answer as if more fully set forth herein.

49.        Upon information and belief, on or about August 29, 2006 plaintiff did knowingly and fraudulently induce defendant QW Express to accept for shipment some 68 trunks wrongly identified as "Exhibit Material" for shipment to a trade show in Arizona.

50.        On or about the same date, QW Express dispatched Fast Fleet, as its local agent, to pickup said "Exhibit Material" from plaintiff and cause it to be forwarded on via an alternative air carrier to Arizona.

51.        Plaintiff knew or should have known that the shipment in question consisted of approximately $1,500,000.00 in assorted silver jewelry, not merely "Exhibit Material". Plaintiff's counsel has admitted that the true nature of the goods shipped was intentionally misidentified.

52.        Plaintiff knew or should have known that virtually every transportation company and motor cargo insurance company will refuse to handle or insure shipments of jewelry. If such jewelry shipments are handled

there is a substantial fee for declared value coverage. Fast Fleet's own cargo liability insurance was limited to $25,000.00 per shipment and would not have covered silver jewelry. Fast Fleet's tariff provides for an additional fee of $.50 per every $100.00 of declared value of any shipment it handles. If the plaintiff's shipment was a covered commodity (which it was not) Fast Fleet would have charged QW Express $7,500.00 declared value fee to handle such a shipment and obtained a special endorsement from its insurer prior to handling any such shipment. Plaintiff chose a declared value of $0, for goods it now claims were worth $1,500,000.00.

53.     Plaintiff knew or should have known that if it declared the true value of its shipment, they would have been subject to substantial additional charges from QW Express. In order to avoid those excess value charges, plaintiff wrongfully and fraudulently claimed that it was shipping "Exhibit Material" with zero declared value rather than the true commodity of silver jewelry with a claimed value of approximately $1,500,000.00. As a result of this "shipper fraud", Fast Fleet was wrongfully deprived of its insurance coverage; wrongfully deprived of any opportunity to charge additional fees necessary to handle such high value shipments; and deprived of a legal defense to this action by its insurer..

## AS AND FOR A SECOND COUNTERCLAIM

54.     Fast Fleet repeats and realleges paragraphs 1 through 53 of its Answer as if more fully set forth herein.

55.     Upon information and belief, plaintiff knows or should know that the claims against Fast Fleet are without legal or factual basis and are frivolous in nature and made in bad faith.

56.     Upon information and belief, plaintiff has brought this action fraudulently and/or solely to harass and intimidate Fast Fleet without legal justification or support. As a result of plaintiff's wrongful action in bringing and maintaining this suit, Fast Fleet has suffered and incurred expenses and losses it would not otherwise have incurred.

WHEREFORE, Defendant Fast Fleet prays that plaintiff's Amended Complaint be dismissed and that Defendant Fast Fleet be awarded costs, attorneys' fees and such other and further relief as this Court deems just and proper, including compensatory and punitive damages on the First and Second Counterclaim.

## AS AND FOR A CROSS-CLAIM AGAINST QW EXPRESS

### FIRST COUNT INDEMNIFICATION

57. Fast Fleet repeats and realleges paragraphs 1 through 56 of its Answer as if more fully set forth herein.

58. At all times, Fast Fleet acted as QW Express' agent in connection with the plaintiff's shipment. The pickup and transfer of the shipment was performed on QW Express' paperwork, in their name, place and stead. QW Express relies upon agents to perform essential transportation services which taken as a whole constitute a single business enterprise. Fast Fleet performed all services at the direction and request of QW Express, without any negligence, nor causing any loss or damage to plaintiff's shipment, in a reasonable and professional manner.

59. Upon information and belief, QW Express maintains a motor cargo insurance policy covering its employees, agents and contractors who all act in concert to form a single business enterprise. Fast Fleet is a covered "insured" in connection with plaintiff's shipment and entitled to the benefits of legal defense and indemnification provided by said insurance policy as a third-party beneficiary of such insurance coverage..

WHEREFORE, Defendant Fast Fleet prays for judgment against defendant, QW Express compelling QW Express and/or its insurer to defend, indemnify and hold Fast Fleet harmless from plaintiff's claims in this action; and awarding costs, attorneys' fees and such other and further relief as

this Court deems just and proper, including compensatory and other damages on the First Count of the Cross-Claim.

## SECOND COUNT DECLARATORY JUDGMENT

60.     Fast Fleet repeats and realleges paragraphs 1 through 59 of its Answer as if more fully set forth herein.

61.     Upon information and belief QW Express knew or should have known that plaintiff's shipment contained silver jewelry and not the stated commodity, "Exhibit Materials". QW Express failed to reveal the true nature of the shipment to its agent, Fast Fleet, thereby causing Fast Fleet's insurance coverage to be nullified with regard to this shipment.

62.     At no time has QW Express filed any claim against Fast Fleet in connection with plaintiff's shipment. Under the Carmack Amendment, and Fast Fleet's tariff terms and agreements with QW Express, Fast Fleet's liability is limited to $.50 per pound or $50.00 for any loss or damage to a QW Express shipment while in the care custody and control of Fast Fleet. See Fast Fleet tariff and Excess value terms attached as Exhibit A.

WHEREFORE, Defendant Fast Fleet prays for judgment against defendant, QW Express declaring Fast Fleet not liable for any part of plaintiff's claims, either directly or indirectly; declaring that Fast Fleet has no liability to QW Express for any loss or damage to plaintiff's shipment; and awarding costs, attorneys' fees and such other and further relief as this Court deems just and proper, including compensatory and other damages on the Second Count of the Cross-Claim.

## AS AND FOR A THIRD-PARTY COMPLAINT

## AGAINST ONE BEACON INSURANCE CO.

## COUNT ONE

63. Fast Fleet repeats and realleges paragraphs 1 through 62 of its Answer as if more fully set forth herein.

64. At all relevant times, defendant One Beacon Insurance Company provided Fast Fleet with a motor cargo liability policy covering Fast Fleet and its agents, Station Operator Systems and RCT Xpress, for loss or damage to customers' freight shipments in their care custody and control.

65. One Beacon has failed and refused to honor its commitment to indemnify or defend Fast Fleet in connection with plaintiff's shipment in this litigation and another shipment handled by RCT Xpress in the San Francisco area (where there is other litigation pending).

66. The contract of insurance requires One Beacon to pay for the claimed losses; or at its option, provide a legal defense. One Beacon interprets its contract to read that it may do either, but has done neither. In this case One Beacon further claims that plaintiff's intentional misidentification of the freight commodity being shipped, voids Fast Fleet's coverage although Fast Fleet had no way of knowing the true commodity being shipped.

67. As a result of One Beacon's bad faith denial of coverage and breach of insurance contract, Fast Fleet and RCT Xpress have incurred substantial costs for legal defense of these two lawsuits.

WHEREFORE, Defendant Fast Fleet prays for judgment against Third-Party defendant, One Beacon Insurance Company compelling One Beacon Insurance Company to defend, indemnify and hold Fast Fleet harmless from plaintiff's claims in this action and the pending California action; and awarding costs, attorneys' fees and such other and further relief as this Court deems just and proper, including compensatory, punitive and other damages on the First Count of the Third-Party Complaint.

## AS AND FOR A THIRD-PARTY COMPLAINT AGAINST STATION OPERATOR SYSTEMS. INTEGRITY TRANSPORT. INC AND EDWARD EGAN

## COUNT ONE

68. Fast Fleet repeats and realleges paragraphs 1 through 67 of its Answer as if more fully set forth herein.

69. Station Operator Systems, Inc. ("SOS") and Integrity Transport, Inc. ("IT") are New Jersey corporations licensed and contracted by Fast Fleet to provide transportation services to Fast Fleet customers for shipments originating or terminating at or about Newark Liberty International Airport, pursuant to the terms and conditions of a certain Station Operator Agreement ("SOA") executed by the parties in August of 2003. Attached as Exhibit B. All of these Third-Party defendants conduct business at 475 Division Street, Elizabeth, New Jersey and Edward Egan resides at 8 Burnside Court, Cranford, New Jersey.

70. SOS and/or IT actually provided the services (on behalf of Fast Fleet) rendered to QW Express in connection with plaintiff's shipment. At no time was the shipment in the care custody or control of Fast Fleet, except through its contractors SOS, IT and Edward Egan, individually.

71. Pursuant to the terms of the "SOA", SOS, IT and Edward Egan, individually, jointly and severally agreed to indemnify and hold Fast Fleet harmless from any loss cost or expense (including attorneys fees) arising from any claims or incidents such as the instant litigation claims made by plaintiff.

72. In the event that plaintiff is successful in proving all or any part of its claims against Fast Fleet, Fast Fleet seeks indemnification and/or contribution from and judgment against SOS, IT and Edward Egan, individually, jointly and severally, pursuant to the terms of the "SOA".

**W H E R E F O R E ,** Defendant Fast Fleet prays for judgment against Third-Party defendants, Station Operator Systems, Inc., Integrity Transport, Inc. and Edward Egan, jointly and severally, compelling them to defend, indemnify and hold Fast Fleet harmless from plaintiff's claims in this action; and in the event of any judgment granted plaintiff against Fast Fleet, judgment over against Station Operator Systems, Inc., Integrity Transport, Inc. and Edward Egan, jointly and severally, in the same amount as any judgment so granted plaintiff and indemnifying Fast Fleet, and awarding costs, attorneys' fees and such other and further relief as this Court deems just and proper, including compensatory and other damages on the First Count of the Third-Party Complaint against these defendants.

Dated: July 10, 2007

**LAWRENCE P. THEES, ESQ**
Attorney for Defendant, Fast Fleet Systems, Inc.

By:____ /s/ Lawrence P. Thees_____
407 Green Avenue
Brielle, New Jersey 08730
732-489-7900, Fax 732-875-0753

# FAST FLEET SYSTEMS

I N C O R P O R A T E D

1414 Calcon Hook Road, Sharon Hill, PA 19079
610-237-3990, FAX 732-875-0753

### Customer Declared Value Election Form

_____ ("Customer") agrees as follows:

Customer has read and understands and agrees to the terms of the Fast Fleet Systems, Inc. (hereinafter "Fast Fleet") Rate Sheet Tariff which contains its conditions of service (Contract) contained therein.

#### OPTION ONE: DECLARED VALUE AGREEMENT

The customer requests Fast Fleet to provide excess value coverage on all shipments when the customer's housebill or inbound masterbill indicates excess value is required. Please note that Fast Fleet will charge, and Customer agrees to pay, an excess value charge of $ 0.50 per $100.00 of declared value as stated on Customers' housebill, masterbill or faxed alert. This charge is subject to a minimum of $5.00 for coverage up to $1,000.00 and a maximum of $125.00 for our maximum coverage of $25,000.00. Any shipment with a value in excess of $25,000.00 will require prior arrangements and a special endorsement without which, it will have an agreed release value of $25,000.00. Otherwise, and in the event Customer elects not to pay for excess value coverage, or fails to elect either option, then all shipments handled by Fast Fleet, shall be treated as No Value Declared shipments and subject to the limitations set forth in Option Two below.

#### OPTION TWO: NO VALUE DECLARED POLICY
#### (This option is automatically applied by use of our services without any other signed and accepted election)

In the event of a claim for: loss; theft; damage; pilferage; delay; negligence; employee or contractor dishonesty; or special, consequential, compensatory and/or punitive damages, Customer specifically agrees that Fast Fleet shall be liable for only $0.50 per pound on the affected weight of your shipment, up to a maximum of $50.00 per shipment. Customer agrees that this $0.50 per pound limitation shall apply to all C.O.D. shipments as well. Customer understands that the service charge made by Fast Fleet on C.O.D. shipments is solely to cover the additional service provided by Fast Fleet for collecting the C.O.D. funds and that this service charge does not increase the liability of Fast Fleet beyond said $0.50 per pound on the affected weight of our shipment.

Initial: _____ YES (CHARGE US EXCESS VALUE FEE) _____ NO (ALL FREIGHT NVD)

Customer further agrees that all freight charges must be current, without offset, before Fast Fleet will consider payment of any claim. "Fast Fleet" includes its trade names of RCT Xpress; Personal Touch Freight Systems; ACE Air Freight and all Fast Fleet Systems subcontractors, agents and employees. Customer further agrees that it waives any rights of subrogation against Fast Fleet by it or its insurer for any claim that it or its insurer pays to any third party without the written consent of Fast Fleet.

Signed: _____ Dated: _____

Name &Title: _____

Company : _____

Accepted by Fast Fleet: _____

PHL: (610)237-3990, FAX (610)237-3995
MDT: (717)939-8770, FAX (717)939-8773

_"Fast Fleet Wants You!"_
EWR (908)558-9600, Fax (908)558-0919

JFK: (718)244-0853, FAX (718)244-1657
SFO: (650)871-4335, FAX (650)871-4366

# EXHIBIT A

## FAST FLEET SYSTEMS
I N C O R P O R A T E D
475 Division Street, Elizabeth, NJ 07201
(905)558-9500, FAX (908)558-0919
AND

*PERSONAL TOUCH FREIGHT SYSTEMS*
( 908)354-6800 Fax (908)354-6880

## EWR RATES

**SPECIAL RATES:**

**NJ POINTS:** MONDAY THRU FRIDAY

| AREAS | MINIMUM | CWT | 1000 | 2000 | 5000 | 00-1700 | 01-0959 | SAT | SUN |
|---|---|---|---|---|---|---|---|---|---|
| A | $14.25 | $7.25 | $5.75 | $5.25 | $5.60 | $48.00 | $68.00 | $90.00 | $90.00 |
| B | $16.00 | $8.00 | $7.25 | $6.75 | $6.15 | $67.00 | $84.00 | $95.00 | $110.00 |
| C | $17.50 | $8.75 | $8.25 | $7.25 | $8.50 | $96.00 | $116.00 | $125.00 | $135.00 |
| D | $23.75 | $10.75 | $10.25 | $8.75 | $9.00 | $110.00 | $130.00 | $140.00 | $160.00 |
| E | $50.00 | $16.75 | $14.25 | $13.75 | $11.00 | $135.00 | $156.00 | $165.00 | $175.00 |

*Area E is a second day point and same day service may require a Special surcharge.

**NY POINTS:**

| AREAS | MINIMUM | CWT | 1000 | 2000 | 5000 | 00-1700 | 01-0959 | SAT | SUN |
|---|---|---|---|---|---|---|---|---|---|
| G | $17.00 | $9.75 | $9.25 | $9.00 | $9.25 | $69.00 | $98.00 | $110.00 | $120.00 |
| H | $21.00 | $11.50 | $10.75 | $10.25 | $9.50 | $99.00 | $110.00 | $120.00 | $130.00 |
| I | $27.25 | $13.25 | $12.50 | $12.00 | $11.00 | $110.00 | $130.00 | $160.00 | $175.00 |

Note- All above areas are Fast Fleet designated and based on proximity to Newark Airport, (not AO! Areas).
These rates must be read with an accompanying Fast Fleet points list with the designated areas.

**ACCESSORIAL CHARGES IN ADDITION TO ABOVE RATES:**

| | |
|---|---|
| AIRPORT DROP | $7.00 OR .50LB. |
| COD/FCOD FEE | $25.00 |
| DECLARED VALUE | $60.00 OR .50/$100. DECLARED |
| DIM FACTOR | 184 |
| DOCK TRANSFER | $7.00 OR .50LB. |
| INSIDE DELIVERY | $10.00 OR .50LB. |
| LIFTGATE SERVICE | $60.00 |
| PALLET JACK | $25.00 |
| RAILROAD PU OR DEL | $40.00 |
| RESIDENCE/CALL B4 | $10.00 OR .50LB. |
| TICKET COUNTER | $30.00 |
| TWO MAN | $75.00 per hour or fraction thereof |
| UNCRATING/PACKING | QUOTE ONLY |
| WAITING TIME (TRUCK) | $40.00 PER HOUR OR FRACTION |
| WAITING TIME(TRAILER) | $50.00 PER HOUR OR FRACTION |
| AIR RIDE | $100.00 |
| PIER | $36.00 |

**STATION INFO:**

HOURS: **MON THRU FRI: SATURDAY;** **SUNDAY:**
0500-2300 AM. SVC., SWEEP, SPECIALS SPECIALS ONLY

CONTACT: Ed Egan, EWR Station Owner
Cheri Egan, Terminal Manager
Cheryl Vasquez, Customer Service Manager
John DeFilppo, Night Operations Manager

ADDITIONAL TERMS: The effective date of these rates is August 15, 2005. All shipments handled by Fast Fleet Systems, Inc. ("Fast Fleet") and its agents contractors will be deemed to have a value of $.50 per pound of the portion of any shipment which may have been lost, stolen, damaged or destroyed while under the control of Fast Fleet, or $50.00, whichever is lesser, unless a higher value is declared in writing and a fee of $.50 per $100.00 of such declared value is paid by the customer to Fast Fleet. All Fast Fleet charges are due and payable within 7 days of billing and in the event a customer fails to pay said charges within 30 days, customer shall be liable for additional charges including collection costs, and/or attorney's fees together with interest in the amount of 1.5% per month on any balance due over 30 days; and Fast Fleet shall have a lien on any and all of customer's shipments and/or control for all money due Fast Fleet.

Fast Fleet Systems, Inc. corporate offices are located at., 1414 Colconnhook Road, Sharon Hill, PA 19079

"Fast Fleet wants you..."
Please call us for our JFK, PHL, MDT & SFO rates!

# EXHIBIT B

### FAST FLEET SYSTEMS
### STATION OPERATOR AGREEMENT

THIS AGREEMENT is made as of this 25th day of August, 2003 by and among Fast Fleet Systems, Inc., a New Jersey corporation (hereinafter referred to as "Fast Fleet") with its principal offices located at 29 Lister Avenue, Newark, New Jersey, 07105, Station Operator Systems Inc. (hereinafter referred to as "Station Operator"), a New Jersey corporation with its principal offices located at 29 Lister Avenue, Newark, New Jersey 07015; and Edward Egan, individually, residing at 7 Burnside Avenue, Cranford, New Jersey 07016 (hereinafter referred to as "Edward Egan") who hereby mutually agree as follows:

WITNESSETH:

WHEREAS, Fast Fleet is engaged in the business of pick-up and delivery, freight handling, storage, distribution, transportation and related activities utilizing the services of independently owned Station Operators; and

WHEREAS, Station Operator desires to become associated with Fast Fleet whereby Fast Fleet will provide certain consulting, financial, sales and marketing services; and

WHEREAS, Fast Fleet desires to retain the services of Station Operator to provide pick-up and delivery, freight handling, transportation and related services for Fast Fleet customers within the Station Area, more particularly defined herein;

NOW, THEREFORE, in consideration of the above stated premises and the terms set forth herein, it is agreed by and between the parties as follows:

A. OBLIGATIONS OF FAST FLEET

1. During the term of this Agreement, Fast Fleet shall maintain the reputation of Fast Fleet and promote its name, image and quality of Fast Fleet and Station Operator service to potential and existing customers of Fast Fleet.

2. Fast Fleet shall provide to Station Operator each of the following basic services:

(a) Financial services as specifically described herein; and such other services as may reasonably be offered to future Station Operators as Fast Fleet expands its system.

(b) Limited ongoing assistance, consultation and advice as required by Station Operator, concerning the general operations of the Station, including on site consultation by Fast Fleet representatives to be arranged at the parties' mutual convenience.

(c) Limited ongoing sales and marketing assistance, from time to time, which generally promotes the Fast Fleet system and specifically promotes Fast Fleet in the Station Area (hereinafter defined) to existing and potential Fast Fleet customers.

3. Fast Fleet shall utilize Station Operator on an exclusive basis for pick-up and delivery, freight handling, storage, distribution, transportation and related activities for all of its customers requesting such service within the Station Area, originating or terminating in the Newark International Airport area, in accordance with the rate schedule and points of service list annexed hereto as Exhibit A. The Station



# EXHIBIT B

Area is defined as the geographic area surrounding Newark International Airport comprised of all cities, towns and areas listed as points of service in Exhibit A. In the event that Station Operator declines or is unable to honor Fast Fleet's request for pick-up and delivery, freight handling, storage, distribution, transportation and related activities for any of Fast Fleet's customers within the Service Area, Fast Fleet hereby has the right to utilize another station operator within the Service Area for pick-up and delivery, transportation, handling and related services for any of its customers within the Service Area, limited to the specific business declined by Station Operator.

4. For the duration of this Agreement, Fast Fleet grants Station Operator a license to utilize the Fast Fleet name and logo for all of its activities pursuant to this Agreement within the Station Area.

## B. OBLIGATIONS OF STATION OPERATOR

1. Station Operator agrees to maintain and operate an airfreight pickup and delivery terminal in the Station Area under the name and logo of Fast Fleet only. The initial premises shall be located at the address set forth in Exhibit A. Station Operator shall not move the Station to any other location without the prior consultation with Fast Fleet. Station Operator grants Fast Fleet an irrevocable license to enter upon the Station premises at any time to inspect the operations and insure the proper handling and service to Fast Fleet customers during the term of this Agreement.

2. Station Operator agrees to provide and maintain a fleet of vehicles and drivers, whether contract truckers, leased, or employee operated, of sufficient size and number necessary to service Fast Fleet customers in a prompt, efficient and professional manner in accordance with reasonable industry standards. Station Operator represents that it is fully aware of the equipment and personnel required by Fast Fleet in the Station Area and the service requirements of the industry, generally, and of Fast Fleet customers, specifically. All drivers and vehicles shall be identified as representing Fast Fleet and Fast Fleet customers by a prominent display of a combination of uniforms, logos, placards and signs, only if same are provided to Station Operator by Fast Fleet Systems.

3. Station Operator shall file a certificate of doing business under an assumed or fictitious name with the appropriate local, county or state office and conduct all business with its customers as Fast Fleet. If this Agreement is terminated for any reason, Station Operator shall file an appropriate termination of such assumed or fictitious name, within five (5) business days, with the city, county or state office. In the event Station Operator fails to file such termination, Fast Fleet is hereby authorized to do so in the name, place and stead of Station Operator.

4. Station Operator agrees that all customers served by Station Operator hereunder are, and shall remain, the sole accounts of Fast Fleet and Fast Fleet shall, at all times retain its proprietary interest in such accounts whether pre-existing or later developed by either Fast Fleet or Station Operator. All customers serviced by Station Operator shall be deemed to be customers of Fast Fleet and Station Operator agrees that from the effective date of this Agreement, and during the full term of this Agreement, Station Operator shall not privately bill or invoice any customer whatsoever, under its own name, without the prior written consent of Fast Fleet.

5. Station Operator shall answer all telephones as Fast Fleet, EVO Air Van or Personal Touch, as the case may be, and agrees that it will not change, divert or discontinue any published telephone number without the prior written consent of Fast Fleet. The main Fast Fleet telephone and fax numbers shall be the sole property of Fast Fleet and Fast Fleet shall be authorized to pay each monthly telephone invoice and charge it back to Station Operator. Upon the termination of this Agreement in accordance with the provisions herein, Station Operator agrees to transfer and assign to Fast Fleet any published telephone number utilized by Station Operator for Fast Fleet business. To this end, Station Operator agrees to sign

2

any form required by the telephone company to accomplish such transfer, and hereby authorizes Fast Fleet to sign any such form in the name, place and stead of Station Operator, at any time during this Agreement.

6. Station Operator and Fast Fleet shall promptly pay when due all taxes, fees, assessments and/or fines levied or incurred by reason of their performance under this Agreement. Station Operator and Fast Fleet agree to pay all expenses incurred in connection with their business operations and performance of their obligations hereunder. Station Operator and Fast Fleet agree not to incur any debt, liability or obligation of any kind in the name of the other without the prior written consent of the other party. The license and obligation to use the Fast Fleet name and logo is expressly limited and intended solely as a sales and marketing aid in the conduct of business on behalf of Fast Fleet and its customers and in no way authorizes Station Operator to obtain credit or incur any debt or obligation in the name of Fast Fleet. Conversely, Fast Fleet is in no way authorized to incur any financial obligation on behalf of Station Operator. Any violation of this paragraph by Station Operator or Fast Fleet, as the case may be, will not only be grounds for termination of this Agreement by the aggrieved party, but also for an action by said party for indemnification and damages if not cured within thirty days of notice thereof.

7. Station Operator shall obtain and maintain at its expense the following insurance coverage:

a. Comprehensive public liability insurance of not less than FIVE MILLION DOLLARS ($5,000,000.00) limit for personal injury liability and ONE HUNDRED THOUSAND DOLLARS ($100,000.00) limit for property damage;

b. Motor Cargo insurance in the amount of TWENTY FIVE THOUSAND DOLLARS ($25,000.00) per vehicle and TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) terminal coverage, or such other amounts as may be reasonably required by Fast Fleet customers and/or to keep pace with inflation and market conditions;

c. Workers compensation insurance covering Station Operator and its employees;

d. Commercial truck and auto liability insurance of not less than ONE MILLION DOLLARS ($1,000,000.00) limit for personal injury and ONE HUNDRED THOUSAND DOLLARS ($100,000.00) limit for property damage.

The above policies shall all include an endorsement naming Fast Fleet as an additional insured and Station Operator shall be responsible to provide Fast Fleet with a certificate of such insurance coverage annually which provides for immediate notice to Fast Fleet in the event of termination or cancellation of any such policy. Fast Fleet may require Station Operator to increase the amount of coverage from time to time in order to keep pace with commercially reasonable increases required by Fast Fleet customers or governmental agencies or simply to keep pace with inflation. In the event Station Operator fails to obtain and maintain the insurance policies required hereunder, Fast Fleet is authorized to obtain such insurance coverage and charge the cost thereof, plus a 5% service fee, to Station Operator.

8. Subject to its actual knowledge, Station Operator shall give Fast Fleet immediate notice of any damage to property or injury to persons occurring upon the Station premises or in the transportation of freight by Station Operator in the Station Area likely to give rise to liability in excess of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00). Station Operator shall indemnify Fast Fleet and hold Fast Fleet harmless from and against any claim, loss, cost or expense, including reasonable attorneys' fees and expenses, arising out of the performance of Station Operator of its obligations under this Agreement to the extent that said incident is not the responsibility or caused by Fast Fleet or any of its employees, agents or business invitees or guests. Fast Fleet in turn agrees to indemnify Station

Operator and hold Station Operator harmless from and against any claim, loss, cost or expense, including reasonable attorneys' fees and expenses, arising out of the performance of Fast Fleet of its obligations under this Agreement to the extent that said Incident is not the responsibility or caused by Station Operator or any of its employees, agents or business invitees or guests.

## C. PAYMENTS AND FINANCIAL ARRANGEMENTS

1. Station Operator shall submit to Fast Fleet, or its factor, on a weekly basis all paperwork and documentation in its possession necessary to invoice Fast Fleet customers for services provided, in duplicate, separated and rated by customer, in accordance with the guidelines and rates set forth by Fast Fleet pertaining to each said service and each said customer with an itemized cover invoice in the name of Fast Fleet Systems with a remittance address as designated by Fast Fleet. The weekly billing period shall commence each Saturday and close the following Friday.

2. Fast Fleet shall pay Station Operator weekly for services provided hereunder upon the following terms, or combinations thereof, as determined in accordance with the origin of invoices submitted for payment by Station Operator.

a. Fast Fleet Billing- Ninety Three and one half (93.50%) percent, less wire fees from Fast Fleet to Station Operator, of the gross weekly invoice total within two (2) business days of receipt by Fast Fleet or its accounts receivable factor of all weekly invoices (currently Transfac).

b. Evo Air Van Billing- Ninety Three and one half (93.50%) percent, less wire fees from Fast Fleet to Station Operator subject to the deduction of a 7% commission payable to Evilio Betancourt, of the gross weekly invoice total within two (2) business days of receipt by Fast Fleet or its accounts receivable factor (currently Transfac). The 7% commission paid to Evilio Betancourt shall be paid to Station Operator upon the completion of the payment of commissions to Evelio Betancourt on such accounts which is expected to be completed upon the death of Evilio Betancourt the former owner of Evo Air Van; and

c. Personal Touch Billing- Ninety Three and one half (93.50%) percent, less wire fees from Fast Fleet to Station Operator subject to the deduction of a 8% commission payable to Personal Touch, of the gross weekly invoice total within two (2) business days of receipt by Fast Fleet or its accounts receivable factor (currently Transfac). The 8% commission shall be paid to Station Operator upon the completion of the payment of commissions to Personal Touch which payments are expected to be completed and end either the later of: the passage of five years or when total aggregate commissions paid equal $400,000.00; and

d High Risk Billing- Ninety Three and one half (93.50%) percent of all monies received by Fast Fleet from "high risk" or "cash listed" customers within five (5) business days of receipt by Fast Fleet of payment of any invoice for services provided by Station Operator. A "high risk" customer is any customer whose credit has been revoked by the factor or Fast Fleet and is placed on the Fast Fleet cash list, or who has not been approved for credit by Fast Fleet. In general, Fast Fleet discourages Station Operator from accepting any work from such high-risk customers, and Station Operator shall not be required by Fast Fleet to service such customers, nor shall Station Operator be forbidden to service such customers.

3. Fast Fleet Systems shall provide Station Operator weekly aged accounts receivables reports by e-mail; fax; or via online access, for all invoices generated by Station Operator

4

4. Fast Fleet together with Station Operator shall determine which of its customers are creditworthy and which are not. Station Operator agrees that it is aware of those customers who are currently on the Fast Fleet cash list as attached hereto and Fast Fleet shall update said list from time to time and notify Station Operator of any additions or deletions thereto in writing. Any customer served by Station Operator which appears on the cash list, or which has not been approved in writing by Fast Fleet for credit, shall be deemed a "high risk" customer.

5. Fast Fleet is not a guarantor of payment or collection of invoices to its customers and shall not be responsible for bad debt arising therefrom. Ninety Seven and One Half percent(97.5%) of any item billed by Station Operator which remains open and unpaid for more than seventy seven (77) days, (or any reasonably longer or shorter period offered by Fast Fleet's factor to Fast Fleet) by a Fast Fleet customer, for any reason whatsoever, may be charged back to Station Operator and deducted from any monies due Station Operator from Fast Fleet. Station Operator is authorized and encouraged to use any reasonable collection efforts on behalf of Fast Fleet to collect any such unpaid accounts, upon Fast Fleet's charge back to Station Operator. If Fast Fleet later collects any such item, Station Operator shall be credited with Ninety Seven and three quarters percent (97.50%) of the amount collected. Fast Fleet has no obligation or duty of any nature to provide any collection services for any outstanding invoices. Station Operator shall be solely responsible for monitoring the outstanding invoices, which it has generated and for which it is ultimately responsible. Station Operator acknowledges that it is receiving four and three quarters percent (4.50%) larger percentage of the gross revenue than a standard Station Operator, in part, due to its collection responsibilities and Fast Fleet Systems, Inc. limited responsibilities hereunder.

6. Station Operator shall maintain complete financial records of its entire business in conformity with generally accepted accounting principles, which shall include but not be limited to Federal and State tax returns, invoices, pickup and delivery records and such other records kept in the normal course of business operations. The Station Operator shall keep invoices and bills for at least three (3) years following the end of the calendar year to which such records relate. Fast Fleet shall have the right to audit the financial records of Station Operator during reasonable business hours upon notice to Station Operator.

7. All invoices and net billings will be performed as Fast Fleet invoices prepared by Station Operator. Fast Fleet will not remit any money to Station Operator against billing to any customers other than customers of Fast Fleet as submitted on Fast Fleet or its customers' paperwork.

8. In the event Station Operator fails to fulfill any obligation hereunder, Fast Fleet is authorized to deduct and/or offset against any monies due to Station Operator an amount, which Fast Fleet, in its sole judgment, deems necessary to fulfill such obligation, or to cause such obligation to be fulfilled, including payment of any bill or obligation incurred in the name of Fast Fleet. However, any such payment or deduction, as the case may be, shall be proceeded by a seven day written notice sent to Station Operator by certified mail return receipt requested. Station Operator shall have seven days after receipt of said notice to either pay the bill in question or notify Fast Fleet why said bill is in dispute. In the event of any such dispute, Station Operator shall have the option to actively contest any such bill and agrees to indemnify and hold Fast Fleet harmless and provide a defense with counsel of its choosing during the pendency and through the conclusion of any such dispute. Deduction and payment of rent, telephone and insurance is authorized in advance.

9. Station Operator shall continue to occupy the premises leased by Fast Fleet at 29 Lister Avenue, Newark, New Jersey and assumes full responsibility for all obligations to the Landlord, Ramida Rest Brown, Inc. during the remaining term of the lease, which is due to terminate at the end of September, 2003, and any holdover period. Station Operator will be solely responsible for all reasonable damage repairs as required by the lease. In the event of a dispute or inability to resolve the damages issue

5 

with the landlord prior to August 1, 2003, Station Operator authorizes and directs Fast Fleet to withhold payment of the final two months rent. Fast Fleet agrees to provide a legal defense to any action brought by the landlord, provided however, Fast Fleet will be entitled to recover from Station Operator, the amount of any judgment obtained by the landlord against Fast Fleet.

D. RESTRICTIVE COVENANT

1. Restrictive Covenant. Fast Fleet, Larry Thees, Station Operator and Edward Egan all expressly, and mutually, covenant and agree to each other that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, they will not, within a geographic radius of fifty (50) miles from the principal office of Newark International Airport, directly or indirectly, for themselves or on behalf of others, on their own account, or as an employee, agent or representative for any person, partnership, firm or corporation:

(a) Solicit orders or business for the pick-up and delivery, freight handling, storage, distribution, transportation and related activities in competition with Fast Fleet except on behalf of Fast Fleet,

(b) Contact any past, present or potential future customers of Fast Fleet for the purpose of diverting such customers elsewhere;

(c) Own, manage, control, operate or participate in the ownership, management, or control, or engage as a sales representative or executive, of any business which is engaged in the business of pick-up and delivery, freight handling, storage, distribution, transportation and related activities in competition with Fast Fleet, or

(d) Use, give or divulge to any person any trade secrets, customer lists, price and rate sheets, or any other financial or specialized information, regarding Fast Fleet, which could be used against Fast Fleet by a competitor.

2. Exceptions to the foregoing restrictive covenant are:

a. On the part of Lawrence Thees and/or Fast Fleet; A.C.E. Air Freight Cartage, Inc. permitted in Philadelphia only and Fast Fleet's current operations in PHL and Fast Fleet's operations at JFK Airports; and

b. On the part of Edward Egan and/or Station Operator: any other business in the Station area which provides local pickup and/or delivery, or other service which competes with Fast Fleet, solely as an ancillary part of said business (e.g. air freight forwarding or packing and crating), so long as the local pickup and/or delivery, or other service which competes with Fast Fleet, ancillary part of said business is handled by or referred to Fast Fleet.

3. The parties acknowledge that any breach of any of the provisions of Paragraph D (1) will cause the aggrieved party immediate, irreparable injury and that money damages alone will not provide an adequate remedy to the aggrieved party. The parties hereby expressly acknowledge the right and remedy to have the provisions of this Paragraph D (1) specifically enforced by a court having equity jurisdiction and agree that the aggrieved party shall be entitled to the immediate remedies of injunction, temporary restraining order, specific performance and other equitable relief to prevent a breach of Paragraph D (1) of this Agreement by any of the parties. The parties hereby acknowledge that the injunctive remedies set forth in this subparagraph shall not be construed as a waiver of any other rights or remedies which the parties may have for damages or otherwise. The parties further acknowledge and agree that this

restrictive covenant is relied upon by Lawrence Thees and Fast Fleet in connection with his acquisition of 500 shares of Fast Fleet (50% of total) from Edward Egan pursuant to a separate agreement of even date.

4. Station Operator and Fast Fleet agree that despite their respective business structures, the personal involvement of the Edward Egan is vital to the success or failure of their relationship as generally defined by this Agreement. Accordingly, Edward Egan hereby agrees to devote his best efforts managing the business of Station Operator and Fast Fleet in the station area. This includes Egan's right to hire a manager as well as other rights. Edward Egan agrees to personally guaranty the monetary obligations of Station Operator and to be jointly and severally liable and responsible with Station Operator for chargeback of bad debt; claims; debts or obligations incurred in the name of Fast Fleet; or other liabilities incurred by Fast Fleet as a result of Station Operator's actions or inactions pursuant to this Agreement. Anything set forth herein to the contrary notwithstanding, the personal liability of Edward Egan, aside from advances made pursuant to Section C, paragraph 2 hereof that have not been paid for more than 120 days and have not been written off by Fast Fleet and SOS and collection of which has been assigned to Ed, is limited to debts, liabilities or obligations incurred by Fast Fleet as a result of an intentional breach of this agreement by Station Operator and not merely the result of innocent business failure.

5. Anything set forth in this agreement to the contrary notwithstanding, Station Operator shall be the sole source and have an exclusive for all Fast Fleet business for Newark Airport. This includes all Fast Fleet business that may be conducted through third parties or the addition of new companies that may be purchased and operated by Fast Fleet or any Fast Fleet shareholders; subcontractors, employees or affiliates in any way.

E. OTHER TERMS AND CONDITIONS.

1. In the event of a dispute, breach or default under this Agreement which causes another party or parties to retain legal counsel, then the prevailing party shall be entitled to be compensated for reasonable legal fees incurred for attorneys representing the prevailing parties. In the case of Lawrence Thees who may represent himself or Fast Fleet, pro se, as the law permits, he shall nonetheless be entitled to a mandatory attorney fee of not less than $150.00 per hour (plus any adjustment for inflation during the term hereof), so long as he is then currently admitted to practice law in the State of New Jersey and/or New York and is permitted to represent Fast Fleet.

2. The occurrence of any one of the following events shall constitute default on behalf of Station Operator or Fast Fleet and shall be grounds for termination of the agreement by the other party:

a. Station Operator or Fast Fleet shall be adjudicated as bankrupt, files for protection from creditors under either federal or state bankruptcy laws, become insolvent or if a permanent or temporary receiver is appointed by the court of jurisdiction;

b. Station Operator or Fast Fleet makes general assignment for creditors;

c. Breach of any material term or condition of this agreement, specifically including the Covenant not to Compete contained in Paragraph D (1), which Station Operator or Fast Fleet fails to cure within five (5) days after written notification from the other party to cure same; or

d. A violation by Station Operator or Fast Fleet of any material law or regulation of a governmental agency in connection with the business of Station Operator or Fast Fleet, materially affecting performance hereunder, which violation goes un-remedied after fifteen (15) days notification or

7

the expiration of the time to cure as set forth by the governing body, unless there is a bona fide dispute as to said violations, or the offending party has commenced compliance within said fifteen day period.

e. Except for transfers made by Station Operator for purposes of estate planning, which are hereby specifically permitted, the sale or transfer by Station Operator of the bulk of its assets or any stock shares to a third party without the prior written consent of Fast Fleet or agreement between Fast Fleet and Station Operator, unless the assignee or purchaser signs with Fast Fleet a new standard Station Operator Agreement with a personal guaranty and restrictive covenant signed by the principals of the assignee or purchaser in advance of any such assignment. However, in the event of any such transfer to a third party, Fast Fleet shall not be entitled to any more money than it already earns pursuant to the terms of this agreement. In the event of any such sale, Fast Fleet shall collect all money in the normal course of business and pay any money then due to Egan or his assignee on a weekly basis.

3. Fast Fleet and Station Operator are authorized to enter into this Agreement by virtue of a resolution duly adopted by their respective Board of Directors and are bound by each and every provision of this Agreement as a party hereto. Edward Egan represents and warrants that he is the sole shareholder of Station Operator

4. If any provision of this Agreement shall be declared invalid or illegal for any reason whatsoever, then notwithstanding such invalidity or illegality, the remaining terms and provisions of the within Agreement shall remain in full force and effect in the same manner as if the invalid or illegal provisions had not been contained herein

5. This Agreement may be executed in more than one counterpart, and each executed counterpart shall be considered as the original.

6. This Agreement shall be interpreted in accordance with, and the rights of the parties hereto shall be determined by the laws of the State of New Jersey and the Courts of the State of New Jersey shall have sole jurisdiction of any disputes arising hereunder.

7. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, executors, administrators and assigns.

8. This Agreement may not be amended or supplemented at any time unless by writing executed by the parties hereto.

9. Whenever under the provisions of this Agreement notice is required to be given, it shall be in writing and shall be deemed given when either served personally or mailed, return receipt requested, addressed to Station Operator at its address as set forth herein and addressed to Fast Fleet at its principal office

All notices and other communications under this Agreement shall be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by prepaid cable, telex or telecopier, provided that a copy is sent at about the same time by registered mail, return receipt requested, (iii) one day after mailed, to the addressee, if sent by Express Mail, FedEx, or other express delivery service, or (iv) three (3) days after mailed, to the addressee, by regular mail delivery of the U.S. Postal Service, to the addresses at the following addresses or telecopier numbers (or to such other address or telecopier number as a party may specify by notice given to the other party pursuant to this provision):

8

If to ED EGAN, to:

Edward Egan 7 Burnside Avenue

Cranford, NJ 07016

If to STATION OPERATOR, to:

Station Operator Systems, Inc.

29 Lister Avenue

Newark, NJ 07105

Attention: Edward Egan

If to FAST FLEET, to:

Fast Fleet Systems, Inc.

C/O. Lawrence Thees, President

36-B Mountain Laurel Lane

Brielle, NJ 08730

10  Station Operator may not assign this Agreement or delegate any of his rights or obligations hereunder unless the assignee signs with Fast Fleet a new Station Operator Agreement with a personal guaranty and restrictive covenant signed by the principals of the assignee in advance of any such assignment as set forth and consistent with Section E2c of this agreement. Fast Fleet may assign or delegate its rights or obligations hereunder subject to said assignee complete agreement to be fully bound by all of Fast Fleets obligations set forth herein..

11. This Agreement constitutes the entire agreement between the parties.

12.  Nothing herein is intended to create a partnership, joint venture, or franchise relationship between the parties to this Agreement, their relationship being solely as independent contractors to one another, Fast Fleet to provide certain billing, marketing, financial, and consulting service, and Station Operator to provide freight transportation service. Neither party shall refer to the other or hold out itself or the other party hereto as its partner, joint venturer, or franchisor/franchisee.

13. Station Operator hereby agrees that no consideration has been paid to Fast Fleet for the right to become a Station Operator for Fast Fleet, that no material inducements or financial representations

9



have been made upon which Station Operator has relied in determining whether to become a Station Operator, and that Station Operator has been actively engaged in the type and form of business he currently operates for at least six (6) months prior to entering into this Agreement with Fast Fleet. Station Operator acknowledges that it is fully cognizant of the type of services provided by Fast Fleet hereunder and requires no disclosure other than as has been provided in the normal course of business.

14. Term. The term of this Agreement shall be for an initial period of twenty-five (25) years, commencing as of the date of signing, unless sooner terminated by either party in accordance with the terms and conditions contained herein. Station Operator shall have the right of first refusal to a renewal term of five (5) years upon the expiration of the initial term, pursuant to the then-standard terms and conditions of a Fast Fleet Station Operator Agreement utilized at that time.

IN WITNESS WHEREOF, Fast Fleet has caused these presents to be signed by its duly authorized corporate officers and its corporate seal to be hereunto affixed, and Station Operator has hereunto affixed his hand and seal, the day and year first above written.

Fast Fleet Systems, Inc.                    Station Operator Systems, Inc.

By:                                         By:
Lawrence Thees, President                   Edward Egan, President

                                            Edward Egan

                                            By:
                                            Edward Egan, Guarantor per the terms hereof

10

# EXHIBIT "C"

# AGREEMENT

## BETWEEN
## NICA AND
## STATION OPERATOR SYSTEMS, INC.

THIS AGREEMENT is made and entered into this 1st day of June, 2002 in the County of Norfolk, Commonwealth of Massachusetts, by and between NICA, INC. (NICA), a Massachusetts corporation and Station Operator Systems, Inc., as follows:

WHEREAS, Station Operator Systems, Inc. is engaged in the business of brokering transportation and related services, intends to contract with NICA;

WHEREAS, Station Operator Systems, Inc. has a need for individuals capable of providing contracted services ("Services");

WHEREAS, NICA's principal place of business is located at the following address: 761 Granite Street, Braintree, MA 02184;

WHEREAS, Station Operator Systems, Inc.'s principal place of business is located at the following address: 725 Dowd Avenue, Elizabeth, NJ 07201

WHEREAS, NICA declares that NICA is engaged in an independent business separate and apart from Station Operator Systems, Inc., and has complied with all federal, state and local laws regarding business permits and licenses of any kind that may be required to carry out the said business and the tasks to be performed under this Agreement; and

WHEREAS, NICA declares that NICA is fully qualified to perform its services and enjoys the goodwill of and a reputation for fair dealing with the public.

ED 041904

**Now, THEREFORE,** in consideration of the mutual covenants, herein contained, the sufficiency of which is acknowledged, it is agreed as follows:

## 1. NICA PROGRAM BENEFITS.

1.1    NICA shall provide Independent Contractor drivers with the following benefits listed in parts (a-g):    (Independent Contractors operating bikes, mopeds and motorcycles are covered under a separate policy with different coverage and limits).

    (a)    On-the-job accident insurance that will pay medical related bills on behalf of the Independent Contractors up to four hundred thousand dollars ($400,000) per incident with a two hundred and fifty dollar ($250) deductible;

    (b)    A disability policy for Independent Contractors; benefits begin on the 8th consecutive day out of work due to an injury that occurred while on the job, which will pay up to seventy percent (70%) of average weekly earnings up to five hundred dollars ($500.00) per week;

    (c)    A continuous total disability policy for Independent Contractors who are out of work beyond one hundred and four (104) weeks due to an injury occurring while on the job which will pay up to seventy percent (70%) of average gross commissions up to five hundred dollars ($500.00) per week, subject to SSDI eligibility and offset;

    (d)    Accidental death and dismemberment coverage up to one hundred and fifty thousand dollars ($150,000.00); and

    (e)    Upon request, a tax service to prepare and file annual individual or joint returns at no additional cost to NICA affiliated members. This service is provided to the Independent Contractor on the condition that the Independent Contractor is affiliated with NICA for at least six months of the tax year for which service is provided.

ED. 042704

(f)     Non-occupational benefits with limits of $5,000 in medical coverage with a $250.00 deductible for injuries sustained while not under dispatch. Accidental Death benefit is $10,000. Disability benefits are **not** covered for non-occupational claims.

(g)     Changes to the policy providing the coverage described above will be communicated to Station Operator Systems, Inc. and the Independent Contractors in writing. NICA warrants and represents that each NICA Affiliated Independent Contractor contracting for Station Operator Systems, Inc. shall maintain coverage under the policy at all times and at no time will a lapse in coverage exist.

1.2     NICA will provide Certificates of Insurance to the Independent Contractors and Station Operator Systems, Inc. for the occupational accident coverages evidencing such insurance and an agreement that such insurance may not be cancelled without thirty (30) days' prior written notice to Station Operator Systems, Inc..

1.3     Although NICA does not pay for Occupational Accident insurance, but, rather, the Independent Contractors pay for such coverage, NICA will provide Certificates of Insurance to the Independent Contractors proving such Occupational Accident coverage is in effect and warrants that it shall remain in full force and effect and up to the appropriate levels of coverage at all times during the term of this agreement. Upon request, NICA will provide duplicate Certificates of Insurance for Station Operator Systems, Inc..

**2.**   **INJURIES.** NICA acknowledges the Independent Contractor's obligation to obtain appropriate insurance coverage for the benefit of Independent Contractors and its employees and agents, if any. NICA waives any rights to recovery from Station Operator Systems, Inc. for any injuries that NICA-affiliated Independent Contractors, if any, may sustain while performing services under this Agreement.

**3.**   **PAYMENT TO INDEPENDENT CONTRACTORS.**

3.1     NICA will be responsible for issuing settlement checks (showing NICA or its trust entity IC Declaration of Trust as payor) to the Independent Contractors. Station Operator Systems, Inc.'s responsibility to pay compensation is limited

ED. 042704

to the payment of commission funds for settlement as set forth in Section 3.2 of this agreement and Station Operator Systems, Inc. has no responsibility to pay any additional compensation or to provide any benefits or services to NICA affiliated Independent Contractors. Station Operator Systems, Inc. has no responsibility to pay any compensation or to provide any benefits or services to the Independent Contractors for jobs performed in the Independent Contractor's capacity as a NICA affiliate.

3.2 Station Operator Systems, Inc. will deposit funds for settlement into an account established at Fleet Bank, set up under NICA's trust entity, IC Declaration of Trust.

3.3 In the event NICA does not receive the funds from Station Operator Systems, Inc. in a timely manner, NICA will notify Station Operator Systems, Inc. and give Station Operator Systems, Inc. twenty-four hours to supply the appropriate required funds to NICA. Failure to fund the settlement account with these funds could result in termination of the relationship with Station Operator Systems, Inc..

3.4 NICA agrees, with respect to its affiliated Independent Contractors, to (i) maintain all necessary NICA Applications and Agreements, W-9 forms, Independent Contractor Enrollment Forms, miscellaneous Independent Contractor forms and any applicable lease agreements between Station Operator Systems, Inc. and the Independent Contractors; (ii) transact Independent Contractor's settlement checks based on settlement commission calculations and other Station Operator Systems, Inc. deductions for such items as leased phones, pagers, and uniforms sent to NICA by Station Operator Systems, Inc.; (iii) Prepare the Independent Contractor's settlement checks (showing IC Declaration of Trust as payor) on a regular basis, automatically deducting any fees, escrow, or other deductions they want or need to make from their Station Operator Systems, Inc. compensation. The gross commissions figures should be based on invoices, job, trip or run tickets submitted by the Independent Contractors to Station Operator Systems, Inc. for services rendered by the Independent Contractors.

4. **TAX FILINGS.** For all Independent Contractors that are enrolled with NICA and perform Services for Station Operator Systems, Inc., NICA agrees to: (i) timely issue IRS Forms 1099 (by statutory deadline of 01/31), in NICA's trust entity

IC Declaration of Trust, at year's end; (ii) timely prepare and file annual Federal and State income tax returns, as well as quarterly estimated tax payments upon the Independent Contractors request and filling out of proper required paperwork; and (iii) make all payments, in a timely manner, to the proper governmental agencies or authorities required under State and Federal laws.

**5.    TERM.**

5.1    The term of this Agreement shall commence as of the date first shown above, and shall remain in full force and effect unless terminated by either party upon not less than sixty (60) days' prior written notice to the other, which shall be delivered by registered or certified mail, return receipt requested, to the other party's designated place of business.

5.2    The obligation of either party to notify, defend and save harmless the other under the terms of this Agreement shall continue after the termination hereof with respect to events occurring prior to such termination.

**6.    TERMINATION.** This Agreement may be terminated:

    (a)    Without cause, by sixty (60) days' prior written notice by either party; or

    (b)    With cause, immediately upon material breach of any term of this Agreement by either of the parties.

**7.    INDEPENDENT CONTRACTOR NOTIFICATION.** Upon inception or termination of this Agreement, NICA shall immediately inform the NICA Affiliated Independent Contractors that contract Services for Station Operator Systems, Inc. of the changed status of the relationship between NICA, Station Operator Systems, Inc., and the Independent Contractors and any change in benefits as well as any and all impact upon the Independent Contractors that would result from this change in status.

**8.    LEGAL COMPLIANCE AND DEFENSE.** NICA will undertake and pay for energetic and good faith defense of audits, claims, demands, lawsuits, administrative proceedings, losses, damages, costs and expenses arising out of Independent Contractor status challenges and issues by the NICA Affiliated Independent Contractors performing Services

ED. 042704

under this Agreement. This defense will be determined by NICA, exercising reasonable judgment and good faith. NICA will coordinate with any auditing body or agency regarding Independent Contractor status challenges. Additionally, NICA agrees to be responsible for sending in any requested position statements, legal briefs, etc. (as well as any and all documents to provide an effective defense) to the IRS, state unemployment insurance department, workers' compensation carrier, or any other agency or auditing body.

9. **INSOLVENCY.** Each party acknowledges that it is not currently in bankruptcy or that it has notified the other of its status in bankruptcy. In addition, each party agrees to notify the other of its insolvency or its intention to file bankruptcy or close its business.

## 10. CONFIDENTIALITY.

10.1 NICA agrees to take reasonable precautions to prevent unauthorized disclosure of information that is proprietary to Station Operator Systems, Inc. and to protect the confidentiality of its own proprietary and confidential information of like kind. Access to such information shall be limited to those Independent Contractors who need it in the performance of their duties.

10.2 NICA understands, acknowledges, and agrees that NICA and its employees may, in the course of this engagement, have access to and become aware of confidential information having actual or potential independent economic value to the business of Station Operator Systems, Inc., including but not limited to trade secrets, customer lists, price lists, devices, procedures, systems, policies, and internal records that are used in the operation of Station Operator Systems, Inc. business ("Confidential Information").

10.3 NICA agrees that all Confidential Information is the exclusive property of Station Operator Systems, Inc., whether prepared by NICA or by others. NICA hereby covenants and agrees that NICA will never, directly or indirectly, during the term of this Agreement or after the termination thereof, disclose to anyone or use in any way such information except in the furtherance of the business of Station Operator Systems, Inc., without the prior express written consent of an officer of Station Operator Systems, Inc..

ED. 042704

10.4 NICA agrees that all documents, records, manuals, notebooks, and writings of any kind containing such information relating to the business of Station Operator Systems, Inc. or its affiliated companies, including copies thereof, then in NICA's possession, whether prepared by NICA, Station Operator Systems, Inc., or others, shall be the property of Station Operator Systems, Inc.. Upon termination of this Agreement, and regardless of any dispute, which may exist between NICA or NICA Affiliated Independent Contractors and Station Operator Systems, Inc., NICA agrees to deliver all of this property to Station Operator Systems, Inc..

## 11. LIMITED NON-COMPETE COVENANT.

11.1 NICA further agrees that, during the term of this Agreement and for a period of two (2) years after termination of this Agreement, whether with or without cause, NICA will not, on behalf of itself or anyone engaged in any similar line of business, directly or indirectly solicit business from any of Station Operator Systems, Inc. accounts.

12. **RETURN OF RECORDS.** Upon termination of this Agreement, NICA shall return to Station Operator Systems, Inc. all records, notes, data, memoranda, and equipment of any nature that are in NICA's possession or under NICA's control and that are Station Operator Systems, Inc. property or relate to Station Operator Systems, Inc. business.

13. **PERMITS AND LICENSES.** NICA will maintain in effect during the term of this Agreement any and all federal, state, and/or local licenses and permits, which may be required of entities providing similar services, as NICA.

14. **ASSIGNMENT.** Neither NICA nor Station Operator Systems, Inc. may assign this Agreement, in whole or in part, without the prior written consent of the other party. This Agreement shall be binding upon the parties hereto, their successors, heirs and assigns, as permitted.

15. **MODIFICATION.** If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable,

ED. 042704

either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

**16.** **NO WAIVER OF RIGHTS.** The failure of either party strictly to enforce any provision hereof shall not be construed as a waiver thereof or as excusing either party from future performances in strict accordance with the provisions of this Agreement.

**17.** **NOTICE.** Any written notice required by the terms of this Agreement shall be given either by personal delivery or by certified mail.

**18.** **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by both parties.

**19.** **CHOICE OF FORUM.** It is understood and agreed by the parties hereto that the applicable laws of the Commonwealth of Massachusetts thereunder shall govern the validity of this Agreement and the parties' performance or their respective obligations. Should it become necessary for the parties hereto to litigate their rights, obligations and duties thereunder, the parties agree to litigate in the state courts of Massachusetts.

**20.** **INTEGRATION.** This Agreement embodies the final and complete expression of the intentions of the parties hereto. There are no other prior or contemporaneous oral agreements, representations, covenants, promises and/or undertakings except those expressly contained herein.

**21.** **HEADINGS.** The headings of this Agreement's provisions are for convenience only and shall not control or affect the meaning or construction or limit the scope or intent of any of this Agreement's provisions. All headings shall be subordinate to the meaning of the text of the Agreement.

**22.** **INDEPENDENT CONTRACTOR FACTORS.** The relationship of NICA, Inc. and Station Operator Systems, Inc. as provided in this agreement is based on Station Operator Systems, Inc.'s

ED. 042704

consistent treatment of the individuals as Independent Contractors. This treatment will be based on, but not limited to, the 20 Common Law Factors as Defined by NICA.

23. **ACKNOWLEDGEMENT.** The undersigned, Station Operator Systems, Inc., hereby acknowledges that it has received, read, and understood the 20 Common Law Factors as defined by NICA; and further acknowledges that it has been informed of NICA's requirement for consistent and compliant treatment of, and adherence to the standards governing the use of independent contractors and hereby intends to comply with the same.

24. **ANNUAL ADMINISTRATION FEE.** The undersigned, Station Operator Systems, Inc., hereby acknowledges that it has received and paid an annual administrative fee in the amount of $1000. Station Operator Systems, Inc. furthermore agrees to pay the annual administrative fee on each anniversary of this agreement. Station Operator Systems, Inc. agrees that failure to pay annual fee within 30 days of anniversary renewal may result in termination of agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year set forth above.

NICA, INC. (NICA):                          Station Operator Systems, Inc.:

By_____                 By_____

_____                   _____
Title                                        Title

ED. 042704

# EXHIBIT "D"

ᴵᴺᶜᴼ**INCORPORATED**

*Faxed 9/9/05*

# INDEPENDENT CONTRACTOR APPLICATION AND AGREEMENT

First Name: *HICHAM*　　　　Middle Initial: _____　Last Name: *JIRARI*

Business Name (if any): *JIRARI CORP.*

Street Address: *1218    73 ST*　　　　　　　　　　　Apt. No: *#1*

City: *NORTH BERGEN*　　　　State: *NJ*　　Zip Code *07047*

Home Phone: *201 861-0905*　Pager: *201 388 3696*　SS#/Tax I.D.# *202-016-182*

Date of Birth: *12-12-78* Contracting Company: <u>Station Operator Systems, Inc.-NJ212</u>　Department: <u>Newark, NJ</u>

☐ Tractor-Trailer/Fifth Wheel　☐ Straight Truck　☒ Box Truck (under 18 feet)　☐ Auto/Pick-up/Van　☐ Biker　☐ Moped　☐ Motorcycle

☐ Previous NICA Member If so, for which NICA affiliated company did you previously contract?

## THE AGREEMENT AND ACKNOWLEDGMENT OF TERMS AND CONDITIONS

1. The Applicant states that he/she is an Independent Contractor (hereinafter called "IC") providing messenger/delivery and other contracted services and related activities from or to various companies who have contracted for these services. The Applicant states that he/she is not an employee of NICA or of the Contracting Company (hereinafter called "CC") and is organized as a sole proprietorship, partnership, LLC or corporation. If the IC has any employees, such employees are not covered under the benefits of the NICA program.

2. The Applicant agrees to pay NICA an affiliation fee of $21.00 per week (with reduced fees for Independent Contractors earning less then $400.01 per week in gross commissions for drivers and less then $200.01 for bikers) or $42.00 if bi-weekly or $45.50 if semi-monthly) plus an initial account setup fee/application fee of $25.00. If the applicant operates a straight truck over 18 ft, the applicant agrees to pay an affiliation fee of $37.00 per week. If the applicant operates a tractor-trailer, the applicant agrees to pay an affiliation fee of $48.50 per week. The applicant agrees to have these fees deducted from his/her settlement check. If the Independent Contractor does not perform services, no fees are due and no coverage is in place. Non-payment of the aforementioned fees constitutes immediate grounds for cancellation of the Applicant's affiliation with NICA and grounds for immediate cancellation of all benefits and services to which the Applicant is entitled as an affiliate. Applicant also agrees to have additional fees if any, generated from the cost of doing business with a contractor company or independently, deducted from his/her settlement check. These fees may include but are not limited to applicable rental fees, for communication devices or equipment, uniforms and vehicles.

3. An occupational accident insurance policy, providing medical, disability, dismemberment, non-occupational and death benefits is issued to the Applicant, the cost of which is included in the affiliation fee. The insurance and other benefits will not commence until a settlement check has been processed for the IC covering a particular stated settlement period and applicable NICA fees are deducted.

4. The IC is eligible for preparation and filing of estimated quarterly tax payments, tax escrow service and annual income tax preparation services as an affiliate at <u>no</u> additional cost. NICA maintains copies of these returns and reserves the right to use these returns to aid in the reinforcement of IC status.

5. The Applicant will provide an invoice to the CC for services rendered through NICA, which will become part of an accounting of jobs completed, to be submitted to NICA from the CC. NICA will submit a Confirmatory Invoice and Funding Verification Form to the CC for the purpose of compensating the ICs for their services rendered to the CC. NICA will issue a settlement check to the IC, which shall constitute payment in full of NICA's obligation to the IC. The IC acknowledges that the CC has no responsibility to pay any compensation or to provide any benefits or other services to the IC for jobs performed in the IC's capacity as a NICA affiliate. The IC further acknowledges that NICA is not obligated to provide or guarantee benefits or services other than those expressly provided by NICA through the IC's affiliation with NICA.

6. The IC acknowledges that he/she is engaged in his/her own independently established business and, as such, is <u>not</u> eligible for, and shall not participate in, any employee pension, health or other fringe benefit plans of NICA or the CC's. This includes ineligibility for unemployment benefits. No workers' compensation insurance shall be obtained by NICA or the CC covering the IC or employees of the IC. <u>The IC hereby waives any rights he/she may have under Workers' Compensation Law and reserves his/her right of action at common law.</u>

7. The IC acknowledges that NICA shall have no liability to him/her, directly or indirectly, for claims by or for (a) any taxing authority, regulatory or other governmental agencies or insurers, (b) any termination of requested services to be provided by the IC; or (c) discrimination against the IC for age, gender, race, color, religion, disability, sexual orientation, or availability of time devoted to services rendered by the IC.

**PAGE 1 OF 2**

ED. 010802

8. The IC acknowledges and agrees that he/she may have access to certain proprietor and/or confidential information of the CC or its customers and as such, may be subjected to a background check performed by the CC or its appointed representative. The IC agrees that he/she will not use, communicate, reveal, divulge or otherwise make available such information to any person or entity outside the CC.

9. The IC acknowledges that he/she is totally responsible and not entitled to any reimbursement for any expenses paid or incurred by the IC in the performance of his/her services. In no manner, way, or form shall NICA or any CC become liable or responsible for any such charges or expenses incurred by the IC, unless otherwise expressly agreed to in writing by and between the parties.

10. The IC shall supply, at his/her sole expense, all equipment, tools, materials and/or supplies to accomplish the jobs agreed to be performed. If the IC incurs any charges from the CC for leasing, renting or otherwise using the CC's materials and/or supplies, the IC authorizes NICA to deduct the appropriate charges from the settlement paid by NICA to the IC in consideration of this usage.

11. The IC understands that, as a condition of affiliation, he/she is required to comply in a timely manner with all applicable Federal, State and local income tax filing regulations and may be required to provide NICA with proof of such compliance. The IC understands that he/she is responsible to pay, according to Federal and State laws, his/her income taxes. If the IC is not a corporation, the IC further understands that he/she may be liable for self-employment (social security) tax, to be paid by the IC according to regulations. Since the IC is not an employee, no Federal, State or local payroll taxes of any kind shall be withheld from the IC settlement checks or paid by NICA on behalf of the IC or any of his/her employees. At the IC's request, NICA will deduct from the IC's settlement check monies to be set a side in a tax escrow account for purposes of submitting quarterly estimated tax payments to the Internal Revenue Service.

12. This Agreement, including but not limited to all of its stated or implied benefits, shall terminate when the IC ceases to perform services for the NICA-affiliated company.

13. The IC has no authority to enter into contracts or agreements on behalf of NICA or the CCs. This Agreement does not create a partnership between any of the parties.

14. The IC declares that he/she has complied with all Federal, State, and local laws regarding business permits, certificates and licenses that may be required to carry out the work to be performed under this Agreement. NICA or the CCs may request proof of this compliance.

15. Any notice given in connection with this Agreement shall be given in writing and shall be delivered either by hand to the party or by certified mail, return receipt requested, to the party's address stated herein.

16. Any dispute under this Agreement or related to this Agreement shall be resolved through the process of alternative resolution.

17. This is the entire Agreement of the parties. The IC and NICA agree that there are no verbal understandings changing or modifying any of the terms of this Agreement.

18. If any part of this Agreement is held unenforceable, the rest of this Agreement will nevertheless remain in full force and effect. This Agreement may be supplemented, amended or revised only in writing by agreement of the parties.

19. The IC hereby designates, grants and/or appoints NICA, as its representative and attorney in fact to generally perform all acts necessary and/or incidental to complying with, and facilitating the terms of this agreement including without limitation the receipt of all documents and written communications from any local, state, or federal governmental agencies or authorities.

20. The Independent Contractor will have 72 hours to review this application and agreement and consult with whomever he/she feels is qualified to offer consul and assistance.

21. I have read and understand the terms of this Agreement and acknowledge that I have freely and voluntarily executed this agreement after consultation with the representative of my choice referred to in paragraph twenty (20) of this agreement.

_Juiree Fulleu_
Independent Contractor-Signature                              Date _08 - 16 - 05_

NICA Representative-Signature                                 Date _____

PAGE 2 OF 2

ED. 010802